RAILROAD COMMISSION OF TEXAS ET AL, Petitioner

V.

C. MUREL WILLIAMS, Respondent

No. A-7961. Decided October 18, 1961
Concurring Opinion Delivered April 11, 1962
356 S.W. 2d 131

GRIFFIN, JUDGE, not sitting.

SMITH, JUDGE, concurred in the results but for different reasons.

*Will Wilson,* Atty. Gen., *Houghton Brownlee, Jr., Charles D. Cabiniss, Ben Harrison, Linward Shivers,* Asst. Attys. Gen., for Railroad Commission of Texas, petitioner.

*Verne Maxwell,* Dallas, *Powell, Rauhut, McGinnis, Reavley & Lochridge* and *Frank Douglass,* Austin, with above firm, for American Petrofina Co. of Texas, petitioner.

*Henry Betts, Black & Stayton, Thomas Black* of the firm, Austin, for Southern Natural Gas Co., petitioner.

*McKay & Avery, Wallace H. Scott, Jr.,* Austin, *Wilson & Spivey,* Tyler, for Reynolds Oil Co., petitioner.

*Clark, Mathews, Thomas, Harris & Denius* and *James H. Keahey,* Austin, with above firm, for C. Murel Williams, respondent.

MR. JUSTICE GREENHILL delivered the opinion of the Court.

Murel Williams here seeks a permit to drill a gas well on a 1.65-acre tract. The spacing pattern fixed by the Texas Railroad Commission for the drilling of gas wells in this field in Shelby County, Texas, is one well to each 640 acres. Williams seeks the permit to drill on the 1.65-acre tract in order to prevent confiscation of property under an exception to Rule 37 (the spacing rule) of the Railroad Commission. He did not allege or prove that the well was necessary to prevent waste. The application was denied by the Commission. Upon appeal to the district court, the action of the Commission was reversed and an order entered that the permit be granted to prevent confiscation. In that action, the Southern Natural Gas Co., Reynolds Oil Company, and the American Petrofina Co. of Texas intervened and aligned themselves with the Commission in opposition to the granting of the permit. The action of the trial court in granting the permit was affirmed by the Austin Court of Civil Appeals. 336 S.W. 2d 800. We here reverse the judgments of the courts below and uphold the order of the Railroad Commission on the ground that there is substantial evidence that the permit was not necessary to prevent confiscation.

The basic facts are without dispute and are repeated here substantially as they appear in the opinion of the Court of Civil Appeals' opinion below:

The 1.65-acre tract in question is the east 1.65 acres of a 3.3-acre tract acquired by H. P. and Ruby Williams, Murel's parents, on November 23, 1917. In the same deed to Williams and his wife was a conveyance of the adjoining 37.5 acres. On

January 12, 1920, H. P. and his wife acquired the adjoining 5-acre tract. These three tracts combine to form a parallelogram.

On July 10, 1920, H. P. and his wife conveyed one-half the minerals beneath the 3.3-acre tract to Smith Price. That ownership has remained with Price and his widow.

On December 14, 1935, H. P. and his wife executed a 10-year mineral lease on the 5- and 37.5-acre tracts to J. T. Perryman who assigned it to Pure Oil Company.

On January 7, 1936, H. P. and his wife and Smith Price executed a 10-year mineral lease on the 3.3-acre tract to Ed C. Smith. That lease was ultimately assigned to Pure Oil Company.

This Joaquin gas field was opened in 1936. Pure assigned its leases mentioned above to Southern Production, Inc., on September 13, 1940.

On May 15, 1942, Smith Price executed a pooling agreement with Southern Production Company covering his one-half mineral interest in the 3.3-acre tract.

On May 21, 1942, Southern Production put of record in Shelby County an instrument styled "unit designation" by which it combined and unitized as an operating unit for gas the leases covering the 3.3-, 5-, and 37.5-acre tracts. As stated above, Smith Price had executed a pooling agreement covering his interest, but H. P. and his wife did not authorize the inclusion of their interests in the three Williams tracts in the unit.

On July 1, 1942, Southern Production completed a well known as the Addie T. Stephens No. 1 on acreage which was included in the unit purportedly containing the three Williams tracts. This well produced until 1957. Smith Price participated in the production from the Addie T. Stephens No. 1 during its producing life, but the royalties accruing to H. P. and his wife were held in a suspense account and have never been claimed by them. The three Williams tracts were held under lease by the payment of delay rentals which H. P. and his wife continued to receive until the leases expired.

In December, 1945, and January, 1946, respectively, the leases covering the Williams tracts referred to above expired.

On March 13, 1946, Southern Production executed a release

of the leases as to the 5- and 37.5-acre tracts, and on November 20, 1957, Sinclair Oil and Gas Company, assignee of Southern Production, released the lease on the 3.3-acre tract.

On September 18, 1952, H. P. and his wife gave Murel a general power of attorney to manage their affairs. Under this authority, Murel testified that he "pretty much" managed their affairs thereafter.

On May 1, 1953, Murel, on behalf of H. P. and his wife and through his general power of attorney, executed an oil and gas lease as to the 5- and 37.5-acre tracts to Natural Gas Distributing Company. This lease expressly excluded the 3.3-acre tract. On the same day, H. P. and his wife executed a pooling agreement with Natural Gas covering the 5- and 37.5-acre tracts. This lease was pooled into the H. P. Williams Unit. The H. P. Williams No. 1 well was drilled on the 37.5-acre tract in 1953, and it still produces. The Williams Unit is a noncontiguous unit authorized under the field rules then applicable; i.e., to get together enough acreage to qualify for a 640-acre drilling unit, the parties were allowed to put into the unit scattered leases in various locations in the field.[1]

Murel Williams was instrumental in procuring for Natural Gas various tracts which went to make up the H. P. Williams Unit, and for such work he was given a 1/8th overriding royalty on the production from all the unit. American Petrofina of Texas is the successor to Natural Gas on the leases in this suit.

On January 16, 1958, H. P. and his wife conveyed by warranty deed their rights in all the surface and in an undivided one-half of the minerals of the 3.3-acre tract to Murel, their son. On December 1, 1958, a consent decree was entered in the District Court of Shelby County partitioning the tract between Murel and the widow of Smith Price. Each received equal tracts containing 1.65 acres. Mrs. Price received the west 1.65-acre tract and Murel the east 1.65-acre tract. Neither of the tracts was of sufficient size to be developed for oil or gas in accordance with the rules of the Railroad Commission.

On March 1, 1958, Mrs. Price leased her 1.65-acre tract to S. R. Bright, who assigned to Reynolds Oil Company on October

1. The well on the Williams tract is virtually surrounded on all sides by another producing unit, the Reynolds unit. Petitioners, therefore, argue that the well on the Williams tract (comprising in all some 45.8 acres) is actually draining a large area outside the Williams tract—and that therefore Williams et al. are receiving *more* than their fair share of the gas.

10, 1958. On May 29, 1958, Reynolds applied to the Commission for a permit to drill on its J. L. Grayson Unit, stating that such unit included 3.73 acres under lease from [Mrs.] Smith Price. Reynolds' application was granted, and production was obtained on lands other than the 1.65-acre tract leased by Mrs. Smith Price.

On December 26, 1958, Murel filed with the Commission his application for a well, thus instituting this case.

No attempt has been made by those with an interest in the west 1.65 acres to secure a permit, and their rights, if any, are not involved here.

According to the opinion of the Court of Civil Appeals below and the briefs filed on behalf of Murel, the following is his position: Murel concedes that the partition of the 3.3-acre tract into two 1.65-acre tracts was a voluntary subdivision in violation of the spacing rules of the Commission, and, of itself, does not entitle him to a well on his east 1.65 acres. His position is, however, that the 3.3 acres was constituted a separate tract for oil and gas development purposes on July 10, 1920, when H. P. and his wife, Murel's father and mother, conveyed an undivided one-half of the minerals under the tract to Smith Price. He contends that at that time the common ownership and control of the 5-, 37.5-, and 3.3-acre tracts previously existing in H. P. and his wife was disrupted and was never reunited. He argues that, because the 3.3-acre tract was thereby made a seperate tract for oil and gas development purposes, the tract had a right to at least one well as a matter of law from July 10, 1920, to December 1, 1958, when the tract was partitioned. He then employs the so-called Century Doctrine, *Railroad Commission v. Magnolia Petroleum Co.*, 130 Texas 484, 109 S.W. 2d 967 (1937), to reconstitute the 3.3-acre tract from the two 1.65-acre tracts and claims the alleged right of the 3.3-acre tract to one well for his 1.65-acre tract.

We assume, without deciding, that the 3.3-acre tract owned by H. P. and his wife did become a separate tract for oil and gas development purposes on July 10, 1920, when they conveyed an undivided one-half mineral interest to Smith Price, and that it remained a separate tract until December 1, 1958. What, then, were the oil and gas development rights existing in the tract and the owners of the tract prior to the conveyance of the undivided one-half mineral interest to Murel and the subsequent partition in 1958, and what rights does Murel now have?

If H. P. and his wife had desired to develop separately the 3.3-acre tract prior to conveyance to their son, Murel, they would have had to apply to the Railroad Commission for an exception to Rule 37 on the ground of waste or confiscation. The Court of Civil Appeals and Murel assume that they would have been entitled to a first well on it as a matter of law. We conclude that they would not have been entitled to a well as a matter of law because there is substantial evidence to support a finding by the Commission that at least after production on the adjoining 37.5-acre H. P. Williams tract (beginning in 1953 and continuing to date), H. P. Williams could not have proved that the gas under the 3.3-acre tract was being confiscated; i.e., he could not have proved that without a well on his 3.3-acre tract, he could not recover his fair share of the gas from the 3.3 acres. Since production units are of approximately 640 acres, one well is presumed to drain that amount of acreage. As will be pointed out below, it is undisputed that the H. P. Williams well on his 37.5-acre tract is capable of producing (draining) gas from under the adjoining 3.3-acre tract and that it actually did so. We further conclude, therefore, that the courts below were in error in holding that, as a matter of law, Murel was entitled to a well. Our reasons follow:

The analysis of Murel and the Court of Civil Appeals depends in part on treating the right to a well as a vested right in the land itself. Some cases have language to this effect;[2] but the holdings in them did not turn on the precise point now before us.

■  The right to a well on a tract of land, however, is not a vested right in the land itself, but is a right of the owners of the land. *Railroad Commission v. Magnolia Petroleum Co.*, 130 Texas 484, 109 S.W. 2d 967 (1937).[3] If it were a vested right in the land, then the right of a small tract could not be destroyed by merger with a larger tract. The right of a small tract can, of course, be so destroyed. *Railroad Commission v. Wood*, 95 S.W. 2d 1328 (error refused, 1936).

2.  E.g., Railroad Commission v. Humble Oil and Refining Co., 151 Texas 51, 245 S.W. 2d 488 (1952); Dailey v. Railroad Commission, 133 S.W. 2d 219 (error refused, 1939); Stanolind Oil and Gas Co. v. Railroad Commission, 96 S.W. 2d 664 (no writ history, 1936).

3.  See Charlie J. Meyers, " 'Common Ownership and Control' in Spacing Cases", 31 Texas Law Rev. 18, at 22:

"The error springs from the assumption that every *tract* has a vested right to one well, and that transfers in ownership of the tract cannot destroy that vested right. The mistake in this reasoning is, of course, that it is not the tract, as a parcel of land, that is entitled to a well; it is the owner who has the right."

■ The cases may have spoken of rights in land because it is easier to express the right to a well as one belonging to the tract rather than mentioning the owners of the tract each time. But whether the right belongs to the tract or to the owner is important when considering rights to well permits as exceptions to Rule 37, because the particular facts and circumstances of each landowner's case may or may not justify granting him a permit. It is our conclusion that a landowner must prove that *he* needs a well to prevent confiscation or waste.

■ The argument of Murel and the Court of Civil Appeals is further grounded on the proposition that the 3.3-acre tract was entitled to a first well as a matter of law. Again, there is language in some cases that the owner of a tract of land, which is too small to meet the spacing rules but which is not a voluntary subdivision in violation of those rules, is entitled to a first well on the tract as a matter of law.[4] But, as stated above, the holdings in these cases did not turn on the question decided herein. The reasoning of those cases as to why every landowner of an involuntary subdivision is entitled to at least a first well as a matter of law is given in *Stanolind Oil and Gas Co. v. Railroad Commission,* 96 S.W. 2d 664 (no writ history, 1936) which is perhaps the first case stating this rule:

"Total deprivation of the landowner's vested right to a fair share of the recoverable oil in place under his land is not a proper remedy under our present conservation laws and rules promulgated thereunder." *Stanolind Oil and Gas Co. v. Railroad Commission,* 96 S.W. 2d 664, at page 665.

It thus appears that the courts were perhaps compelled to the conclusion in these cases that the only way to protect the small tract owner was to give him at least one well as a matter of law. We have concluded, however, that such a small tract owner is not necessarily entitled to a first well as a matter of law.[5] He is entitled to the exception, under Rule 37, if it is neces-

4. E.g., Railroad Commission v. Humble Oil and Refining Co., 151 Texas 51, 245 S.W. 2d 488 (1952); Dailey v. Railroad Commission, 133 S.W. 2d 219 (error refused, 1939); Stanolind Oil and Gas. Co. v. Railroad Commission, 96 S.W. 2d 664 (no writ history, 1936).

5. See the discussion by Robert E. Hardwicke, "Oil-Well Spacing Regulations and Protection of Property Rights in Texas", 31 Texas Law Rev. 99. Hardwicke reasons that if the rule (each tract is entitled to a first well as a matter of law) means that the commission may not ignore its own rules, and that tracts subdivided before Rule 37 or the discovery of oil or gas shall be entitled to a well to prevent waste or confiscation, then the rule is sound. If it means that each tract is entitled to a well regardless of the development in the area by the applicant and others, then the rule is not sound.

sary to prevent waste or to prevent confiscation of property. As this Court said in *Gulf Land v. Atlantic Refining Co.,* 134 Texas 59, 131 S.W. 2d 73 (1939), on p. 80:

> "In order to accomplish orderly drilling, the Commission has simply promulgated a rule fixing minimum spacing distances at which wells may be drilled without application, notice, or hearing. Any one desiring to drill a well at a lesser distance must secure a special permit, after notice and hearing. Such applicant assumes the burden of proof that such well is necessary to prevent waste, or to prevent the confiscation of property."

■ The basic right of every landowner, including small tract owners, is to a fair chance to recover the oil and gas in and under his land, or their equivalents in kind. *Gulf Land v. Atlantic Refining Co.,* cited just above. This means that the owners and lessees of some small tracts are entitled to a well on their tracts as a matter of law because there is no other way to give them a fair chance to recover the oil and gas under their land. *Stanolind Oil & Gas Co. v. Railroad Commission,* cited just above. But they must first prove confiscation or waste.

■ The rule of fair chance or fair share is the reason for the "confiscation" exception to Rule 37 whereby an owner or lessee can get a well permit for a small tract. *Brown v. Humble Oil and Refining Co.,* 126 Texas 296, 83 S.W. 2d 935 (1935) ; *Railroad Commission v. Gulf Production Co.,* 134 Texas 122, 132 S.W. 2d 254 (1939). In fact, it has been held that the proper test of confiscation under Rule 37 is whether an owner, with the wells which already exist, has been accorded a fair and equal opportunity with other producers of surrounding tracts within the drainage area to recover his fair share of the oil in place beneath his tract. If he has, no confiscation results. *Gulf Oil Corporation v. Smith,* 145 S.W. 2d 280 (error refused, 1940).

Murel expressly denied a theory of waste in seeking a permit for his 1.65 acres, and has based his claim on confiscation. We think that there is substantial evidence in the record to support a Railroad Commission finding of no confiscation. The Railroad Commission has developed a gas well spacing pattern of one well for each 640 acres in the Joaquin field, and has determined that "development on such 640-acre pattern will provide for adequate drainage of the gas reserves." The 3.3-acre tract is within the Williams' 45.8-acre area which is drained by the H. P. Williams No. 1 well. That well is located on the Williams 37.5 acres im-

mediately adjoining the 3.3 acres. Murel's own expert witness, Ashford, testified:

"Q. And, of course, the H. P. Williams No. 1, which is only about 1000 or 1200 feet from that area, has been draining it, hasn't it?

"A. Yes, sir.

"Q. Probably draining it more than any other well you know of; isn't that right, Mr. Ashford?

"A. Well, it is as close as any other.

"Q. It is as close or closer; is that right?

"A. Yes, sir."

Petitioners' expert witness, Tucker, testified that "there would be absolutely no question that a well as close as the Williams well is to the subject 3.3-acre area would drain that area." Through the H. P. Williams No. 1 well close by on their adjoining land, H. P. and his wife have been draining their own 3.3-acre tract. There seems little doubt, therefore, that the H. P. Williams No. 1 well provided H. P. and his wife with a reasonable opportunity to produce their fair share of the oil and gas under the 3.3-acre tract.

As stated above, Murel employs the so-called Century Doctrine, *Railroad Commission v. Magnolia Petroleum Co.*, 130 Texas 484, 109 S.W. 2d 967 (1937), to reconstitute the two 1.65-acre tracts into the 3.3-acre tract and claims the alleged right of the owners of the 3.3-acre tract to a well for his 1.65-acre tract. But the basic condition of this doctrine is that a well is needed "to protect the vested rights of the owners of such larger tract [the reconstructed tract] to recover their fair share of the oil thereunder in place". *Humble Oil & Ref. Co. v. Lasseter,* 120 S.W. 2d 541 (error dismissed, 1938). In this case none was needed to protect the owners, H. P. and his wife, because they were already draining the tract with their well on the adjoining tract.

If they, as contenants with Smith Price of the 3.3-acre tract, had applied for a well permit for the tract prior to the conveyance to Murel and after the H. P. Williams No. 1 well had begun to drain the 3.3-acre tract, there would have been substantial evidence to support the denial by the Commission of

the application. Murel, their grantee of the undivided one-half mineral interest, could have no better rights to a well permit. To hold otherwise would mean that a grantor of a mineral interest could create valuable oil development rights in his grantee which he himself did not have. This rule is a necessary corollary to the voluntary subdivision rule. That rule prohibits the creation of a right to a well permit on each small tract subdivided from a large one when the owner of the larger tract did not have such right. *Humble Oil and Refining Co. v. Railroad Commission,* 68 S.W. 2d 622 (Texas Civ. App. 1934), affirmed sub nom *Brown v. Humble Oil and Refining Co.,* 126 Texas 296, 83 S.W. 2d 935 (1935).

The opinion of the Court of Civil Appeals below dealt largely with the opinion in *Ryan Consolidated Petroleum Corp. v. Pickens,* 155 Texas 221, 285 S.W. 2d 201 (1955). We do not here reach the problem raised in the *Ryan* case, and that opinion has no application to the decision which we have reached.

The judgments of the courts below are reversed, and judgment is here rendered for the Railroad Commission and the other petitioners.

Opinion delivered October 18, 1961.

SMITH, JUSTICE, concurring.

I concur in the result but do not agree with many of the reasons assigned by the Court as to why the action of the Commissioners in denying Murel Williams a permit was being upheld. In my opinion, the action of the Commissioners in denying the permit was supported by substantial evidence. The evidence is simply this: Williams and Smith Price were the owners of the 3.3 acres involved here. Smith Price executed a pooling agreement covering his undivided 1/2 interest. This 3.3 acres went into the unit. A permit was granted to this unit. Williams deliberately left his 1/2 interest out of both units which had been created. It is my opinion that the 3.3 acres was only entitled to one well and that when the permit was granted, locating the well on one of the tracts with which Price had unitized, the location was just as though the well was actually located on the 3.3-acre tract owned by Williams and Price. Under such circumstances, Williams was not entitled to another well on the 3.3 acres or his one half of that tract. The reasons assigned by Mr. Justice Greenhill for holding against Williams are, in the main, contrary to the well-settled rules of property announced by this Court in

numerous decisions. In view of other cases pending in this Court, I deem it proper to write my views at this time rather than to merely note a concurrence.

Opinion delivered April 11, 1962.