**W. L. PICKENS et al., Appellants,**

**v.**

**RAILROAD COMMISSION of Texas et al., Appellees.**

**No. A-10116.**

Supreme Court of Texas.

Feb. 10, 1965.

Rehearing Denied March 10, 1965.

Prentice Wilson, Roach & Robertson, Dallas, Fred Erisman, Longview, J. W. Hassell, Jr., Dallas, for appellants.

Waggoner Carr, Austin, Atty. Gen., Linward Shivers, Joseph Trimble, Asst. Attys. Gen., Powell, Rauhut, McGinnis, Reaveley & Lochridge, B. D. St. Clair, Austin, Robert B. Payne, Dallas, R. J. Stanton and H. D. Bushnell, Tulsa, Okl., Robert F. LeBlanc, Gentry Lee, C. C. Cammack, Bartlesville, Okl., Alfred O. Holl, William P. Gibson and Wallace G. Malone, Dallas, for appellees.

GREENHILL, Justice.

The main question here is the validity of the order of the Texas Railroad Commission prorating the production allowable of oil from the Fairway (James Lime) Field in Anderson and Henderson Counties, Texas. The order fixed the rate at which the various owners of the oil could produce. The district court found the order to be

reasonably supported by substantial evidence and upheld it. W. L. Pickens and others have brought the case to us by direct appeal. The main law question before us is the same as that before the district court: Is the Commission's proration order reasonably supported by substantial evidence?

█ The formula under attack has two basic elements: (1) the number of surface acres in the production unit on which there is a well, usually 160 acres; and (2) the number of acre-feet of productive sand or rock which are within, or below, the 160 surface acres. The acre-foot is a measure of volume. Some surface acres of the field have, vertically, a thicker section of productive sand below them. An acre-foot, as used here, refers to a horizontal square acre with a thickness of one foot of productive sand. An acre-foot contains 43,560 cubic feet of oil or gas-bearing formation.

In addition to pleading that the order was unreasonable because it did not protect their correlative rights and would permit uncompensated drainage, Pickens et al. pleaded that any formula which was not "based solely on net acre-feet of pay underlying each unit tract" would be unreasonable, would fail to protect their correlative rights, and would deprive them of their property without due process of law. Their witness's testimony was that the formula should have been based 100 percent on acre-feet of productive sand.

The proration order was arrived at in the following manner: the Commission each month determines the amount of oil to be produced from all fields in Texas. It divides this amount among the various fields. The total amount this particular field may produce is determined from time to time and is not fixed in the proration allowable formula here attacked. What the proration order does is to allocate to the wells in the field the part of the total field allowable which each well may produce. There are some exceptions because some wells have but limited capacity, others have a high gas-oil ratio, and so forth. Those wells are given particular allowables and are not here involved. The remaining volume of oil, whatever it is, is divided in half: one-half of the oil is allocated to the wells in that proportion which their assigned surface acreage in the oil field (usually 160 acres) bears to the total acreage in the field (about 21,000 acres); and the other half is distributed among the same wells in that proportion which their assigned acre-feet, their net acre-feet, bears to the total acre-feet in the field. Thus it is said that the formula allows 50 percent for acreage (up to 160 surface acres), and 50 percent for acre-feet.

The Fairway (James Lime) Field was discovered in 1960. It is located in a single structure, a common reservoir, some 9,500 feet below the surface. Early in 1961, the Commission issued an order prorating the field's production on the basis of a formula which was weighted to allow 50 percent for the producing well itself. This is called a "per well" factor. The other 50 percent was credited to surface acreage in the producing unit up to 160 acres. So the first formula was 50 percent per well and 50 percent for surface acreage.

On March 8, 1961, and February 14, 1962, this Court handed down its opinions in the Normanna [1] and Port Acres [2] cases. Those opinions invalidated particular gas proration orders in those fields which contained a substantial [one-third] "per well" factor. Thereafter on May 23, 1962, the Commission withdrew its Fairway Field proration formula which contained the 50 percent "per well" factor and promulgated a proration schedule based 100 percent on surface acreage in each producing unit.

The spacing pattern was, and is, basically 160 acres to the well. No small tracts are

---

1. Atlantic Refining Co. v. Railroad Commission, 162 Tex. 274, 346 S.W.2d 801 (1961) (Normanna Field).

2. Halbouty v. Railroad Commission, 163 Tex. 417, 357 S.W.2d 364 (1962) (Port Acres Field).

here involved. Under that formula, the allowable oil production for each well was determined entirely by the number of surface acres, up to 160, which were situated over productive sand or rock. Pickens protested this formula but did not appeal.

In November and December of 1962, the Commission held a new hearing. On March 6, 1963, it promulgated the order here in question. The Commission retained 160 acres as the spacing unit for wells (about which there is no controversy); and, as stated, it announced that the proration of the allowable production of oil among the wells would be based on a fraction made up of two factors: (1) 50 percent for the number of surface acres over the productive strata, and (2) 50 percent for the number of acre-feet in the production unit. This "50 percent acreage, 50 percent acre-feet" formula will be hereafter referred to as the "50-50 formula." It must be borne in mind that it differs very substantially from another 50-50 formula previously used which allocated 50 percent to the well alone and 50 percent to surface acres.

The total allowable for the field is approximately 40,000 barrels per day. At the time of issuance of the order, there were 135 wells in the field, three of which were operated by Appellant Pickens. On the basis of surface acres in the field, each well on a 160-acre tract would be allowed to produce approximately 302 barrels per day. The witness Latimer testified that when the field was prorated on a 100 percent acreage basis, Appellant Pickens' three wells on 480 of the field's 21,000 acres had an allowable of 333 barrels per day each. The effect of the 50-50 formula was to raise his allowable to between 362 and 378 barrels per well per day. The allowables on other wells having fewer acre-feet were lowered. For example, the Sun Oil Company's Lloyd #1 Well had an allowable of 233 barrels per day under the 50-50 formula.

Pickens and others filed suit in Travis County on April 8, 1963, to attack this order of March 6, 1963. They contend, among other things, that it was unreasonable and was not supported by substantial evidence, mainly, in that it discriminates against people who have the most oil in place under their surface acres, i. e., the most acre-feet; and it allows, they say, an undue advantage to those having the same surface acreage over the oil but fewer acre feet of oil in place. They also contend that it will bring about undue uncompensated draining which will ultimately result in their great financial loss. Pickens et al. seek to bring this case within the decisions of the Normanna and Port Acres cases, supra, as well as the decision in Railroad Commission v. Shell Oil Co., 380 S.W.2d 556 (Tex.1964), which passed upon the proration order in the Quitman Field.

The Commission's order is presumed to be valid. The question is not whether the Commission came to a proper factual conclusion on the basis of conflicting evidence, but whether it acted arbitrarily and without regard to the facts. Railroad Commission v. Manziel, 361 S.W.2d 560 (Tex.1962). Our duty is to look to the record as a whole to see whether the order of the Commission is reasonably supported by substantial evidence. While we look to the record as a whole, our duty is to determine whether there is in the record competent evidence which reasonably supports the order. The evidence is voluminous; of necessity it must be greatly condensed.

The oil-bearing strata in question is several miles across, and is elevated about 130 feet toward its center. The thickest of the oil-saturated sand or rock (some 115 feet vertically) is in the central part of the strata or field. It is not located over subsurface water. If the field could be sliced and looked at vertically, the oil-bearing portion or strata could roughly be compared to an elongated, very gradually sloping crescent, the entire center of which is elevated toward the surface. It may be described as a symmetric recumbent anticline. The "thick" area of the field, which has the most acre-feet of oil-bearing rock, is updip (at

a higher elevation in the structure) from the thinner sections which are toward the ends of the crescent. The thinnest producing rock or sand is some 15 feet thick. The average thickness is about 77 feet. The argument of Pickens is that since there is an average of 77 acre-feet of producing sand below each average surface acre, the 50-50 formula is weighted overwhelmingly in favor of surface acres as contrasted to acre-feet of producing sand. There is not, they say, one acre-foot for each surface acre (which they say would make a 50-50 allocation more equitable), but an average of 77 acre-feet for each surface acre. Hence the areas of thickest sands are not being allowed to produce in proportion to the reserves in place.

Pickens and others relied upon the testimony of H. J. Gruy, a consulting petroleum engineer and geologist. He projected the 77-to-1 figures mentioned above to show that Pickens et al. will ultimately recover amounts substantially less under the 50-50 formula than they would if the formula used were based 100 percent on the number of acre-feet under each tract. His testimony was that oil wells would drain in excess of 160 surface acres, and that Pickens et al. would be the victims of net uncompensated drainage.

Gruy disputed the assertion that there was any water drive or water encroachment in the field. He testified that any water in the wells toward the edge of the field was due to poor cementing of the wells. He conceded that there was water in some of the wells, and that there was water in contact with the oil on the edge of the field. He had not studied the aquifer (water-bearing sand) surrounding the field and underlying a large part of it, but he stood on the proposition of no water encroachment. He conceded that the oil reservoir was not made up of homogeneous rock or sand. He advocated a 100 percent acre-foot formula, "although we don't know enough about these acre feet to differentiate and say, 'Mr. X has got twice as good acre

feet as Mr. Y.'" Gruy was the only witness for Appellants Pickens et al.

The Appellees called five expert witnesses, who were petroleum or production engineers, a petroleum reserve engineer, and a petroleum consultant. These experts agreed that the field was virtually surrounded by water which was in contact with the oil in the field, and that a substantial portion of the field was located over water which was also in contact with the oil. Their testimony was that there was a marked difference in the bottom-hole pressures in the various wells in the field. The wells toward the center of the field and the thick section of the oil-bearing strata had a lower pressure than the wells toward the edge of the field, particularly to the southeast.

The discovery wells were in the southeast part of the field, and that portion of the field had produced almost a year longer than the center section. Yet the pressure in that southeast area has not declined as much, proportionately, as the pressure in the center or thicker section of the field where Appellants Pickens et al. (as well as many of the Appellees, including the Appellee Hunt Oil Company) had their wells. The explanation was that as the oil was withdrawn from the field, water moved into the field around its edges to replace the oil, thus keeping up the pressure. There was evidence that edge wells were making water and that the amount of water in the wells was increasing.

The witness Thomas W. Clay testified that the aquifer which was under portions of the field and adjacent to the field, was very sizable; large enough for a water drive. He concluded that there was not a complete water drive but there would be a limited water drive; that the water would expand. In his opinion, the 50-50 formula gave each operator or owner a reasonable opportunity to recover the oil in place under his tract.

The witness J. R. Latimer, Jr., testified that the aquifer was about three times the

size of the field, and its encroachment explained the maintenance of bottom-hole pressure in the wells located over the water. He said that 52 percent of the field was underlain by water. He pointed out one well which had been abandoned as a non-producer because of water. Another had increased in water production from 40 to 54 percent; another from zero to 54 percent water.

It was Latimer's testimony that substantial quantities of water are in fact moving into the field, and its movement will continue. At first he did not believe that there was enough evidence to support the conclusion that there was a water drive. This belief continued into 1962. But he thereafter changed his mind. While the amount of water now being produced from oil wells is insignificant compared to the total volume of oil which has been produced, water is moving into the field and will continue to do so.

The water, he said, encroaching from the edges of the field, would push the oil updip toward the thicker sections of the strata where Appellant Pickens' wells are located. The thinner sections would be watered out first. In his opinion, a 100 percent acre-foot proration formula would cause an acceleration of the influx of water, and the allowables from the watered-out wells on the thinner tracts would then be transferred to the wells on the thick tracts toward the center of the field.

The witness Latimer further testified to pressure differentials in the field. Oil, he said, will drain toward low pressure. It cannot drain against pressure. The area in the center of the field, around the wells of Pickens et al., has lower pressure than the pressure around the thin or edge tracts.

So his testimony was that net drainage was not *away* from the wells of Appellants Pickens et al. but *toward* them because of (1) the difference in pressure and (2) the force of the water pushing the oil updip. He concluded that the 50-50 formula more nearly gave all the owners an equal oppor-

tunity to produce their in-place reserves. He doubted that even under that formula the edge wells would come even close to producing what was considered to be originally in place because the oil is being pushed past them, updip.

The witness Harold Dixon agreed that the water is increasing in sufficient quantities to move the oil updip to the thicker tracts. He testified that water is presently moving into the field. In his opinion, for the wells on the thin sections to be able to produce the recoverable oil under them, they should have an opportunity to produce their oil before the water pushes the oil updip. The 50-50 formula, he said, affords that opportunity, and would result in allowing the thicker tracts (of Appellants Pickens et al.) to recover more, even far more, than their original in-place reserves.

The witness Fred Oliver agreed that because of the pressure differential, there would be drainage toward the wells of Pickens et al. He disputed the testimony of Pickens' witness Gruy as to the disproportionate amount of ultimate recovery of oil in various portions of the field under the 50-50 formula. He testified that the thin tracts would not have an opportunity to produce their in-place oil under a 100 percent acre-foot formula and that the 50-50 formula gave each owner a reasonable opportunity to recover his in-place oil. He was unable to say that there was a water drive. On the other hand, he could not say that there was no water influx. The area of the aquifer was of sufficient size to affect the reservoir drive or mechanism. The indications are, he said, that there will be a partial water drive in the field, and the water drive will be definitely significant to the edge tracts. Some areas will lose in-place oil by reason of water influx. He would expect that a water drive would be readily apparent within four years. By that time, however, under a 100 percent acre-foot formula, the wells on the thin tracts would be abandoned or their capacity reduced.

Appellees' most positive expert witness was Pat Kelly, a petroleum engineer. Because he was an employee of the Commission and had heard the evidence in this case as a Commission examiner, his testimony was objected to. The admissibility of his testimony is the subject of discussion later herein. He was permitted to testify as to what he knew as an expert and not as to what he had heard as an examiner.

Kelly testified that water was unquestionably moving into the field at this time. He did not know the extent (degree or speed) of the encroachment but "We * * know that it is encroaching. * * * It is known right now that there is water encroachment in the field." The eminence of the water encroachment, he said, put the wells on the thinner tracts in jeopardy of abandonment before the recovery of the in-place oil beneath those tracts. "The watering out of wells that are in close proximity to water is further conclusive proof of a water drive." A 100 percent acre-feet formula would, he said, aggravate the water encroachment. Under it, the thinner tracts would be severely drained. He further objected to the 100 percent acre-foot formula because the reservoir was not homogeneous. There are many variables and unknowns within it, such as structure, pressure, permeability and porosity; and the 50 percent acreage factor in the formula "balanced against the unknowns." It was his opinion that the thinner tracts underlain by water should be permitted to produce at a higher relative rate because this would give them a greater chance to produce their in-place reserves.

 While as stated there is a mass of evidence in this case, some of which is conflicting, and much of which would have supported the Commission if it had entered a different order, the foregoing constitutes substantial competent evidence to support this proration order of the Commission.

There was an abundance of testimony that under the Commission's formula, each operator would have the opportunity to recover his in-place oil reserves. This Court held in the Quitman Field case [3] that in a Rule 37 case (involving a permit to drill a well on a small tract), the landowner is entitled to a fair chance to recover the oil and gas in and under his land or its equivalent in kind to prevent confiscation of his property. But in determining the validity of a field-wide proration order, the landowner is not wholly restricted to a recovery of reserves underlying his land. The test in that case (which is this case) is whether he has an opportunity to produce his fair share of the minerals in the reservoir. Railroad Commission v. Shell Oil Co., 380 S.W.2d 556 at 560 (Tex.1964).

While the Appellants' witness Gruy testified that Appellants would suffer uncompensated drainage under the Commission's formula, there was an abundance of competent testimony that the net drainage was *toward* the Appellants' portion of the field, not only because of water encroachment but because of the difference in pressure. Hence the facts of this case are distinguishable from the Normanna and Port Acres cases (supra, footnotes 1 and 2) where the evidence was undisputed that there would be enormous amounts of uncompensated drainage from the large tracts in question to the small town-lot wells. The evidence in those cases as well as in Railroad Commission v. Shell Oil Co., supra, footnote 3, was that the wells on the small tracts would depend for their production as much as 85 percent on oil or gas drained from under other tracts. There is competent testimony here that there would be little if any drainage toward the edge wells which did not have a thick section of oil-bearing sand or rock; i. e., those wells which did not have as many acre-feet as those wells in the center.

3. Railroad Commission v. Shell Oil Co., 380 S.W.2d 556 (Tex.1964). See also Railroad Commission v. Williams, 163 Tex. 370, 356 S.W.2d 131 at 136 (1962) as to Rule 37 cases.

This Court has taken note before that oil moves to areas of low pressure and that drainage is from areas of high pressure to areas of low pressure. Railroad Commission v. Manziel, 361 S.W.2d 560 (Tex. 1962). In that case as oil was produced, the bottom-hole pressure dropped from 2650 pounds per square inch to an average of 371 pounds p. s. i. Water was forced into the strata from the surface in order to produce the oil that would otherwise be lost. Here in the edge portions of the field, as oil was produced, the pressure did not substantially decline as it did in Manziel. This, and other things, led the petroleum engineers to conclude that the pressure in the wells was being sustained by the intrusion of water from the aquifer which was next to and below much of the field. This Court, in Manziel, noted that pressure was greatest in the Whelan Brothers-Vickie Lynn Unit, and hence, "It stands to reason that under these conditions, the drainage from the Whelan Brothers-Vickie Lynn Unit will continue." 361 S.W.2d at 573. Similarly, we said in the Port Acres case, "That is to say that since the gas in a continuous reservoir will flow to a point of low pressure the landowner is not restricted to the particular gas that may underlie his property * * *." 357 S.W.2d at 375.

Moreover, there is an acceptable reason for allowing the thinner tracts with fewer acre-feet to produce at a higher rate. As set out above, there is evidence that as the oil is withdrawn from the entire field (not just the edge tracts), water rises or comes into the thin or outside areas. This does two things: it cuts down on the recoverable oil in those tracts, and it pushes oil updip toward the thick tracts. If this oil is not recovered before that happens, it is lost to the owners of that tract. Their correlative rights are not protected.

In the Normanna, Port Acres, and Quitman Field cases,[4] this Court struck down

proration formulas having a substantial "per well" factor. Here there is none. Moreover, even in those cases, this Court did not hold that a per well factor made the proration formula invalid *per se*. In the Quitman Field case, we said, "The Commission is not enjoined from adopting any formula which provides less than a 50% well factor * * *." 380 S.W.2d at 561. The Court did not tie the hands of the Commission, and we do not tie them here.

■ Even if it be conceded that Pickens et al. will suffer some injury, that alone is not enough to invalidate the order. "When the orders are supported by evidence * * the fact that the application of the order has resulted in economic loss to some does not warrant a finding that there has been a deprivation of property without due process of law." Railroad Commission v. Manziel, 361 S.W.2d 560 at 565 (Tex.1962).

On the problems of due process and confiscation, the question of whether a proration schedule based on factors other than acre-feet of recoverable oil would wrongfully deprive a person of his property was before the United States Supreme Court in Railroad Commission of Texas v. Rowan & Nichols Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940). The Commission's East Texas proration formula then provided that a [good] well could daily produce 3.2 percent of its hourly potential. This resulted in an allowable of about 22 barrels per day per well for the good wells with the best reserves in place. But of the total number of barrels allowed to be produced from the field, about 73 percent of the total oil produced came from wells which were exempt from the proration formula because they were "marginal wells." Each of these marginal wells was permitted to produce up to 20 barrels per day. It was contended that the proration formula failed to give sufficient weight to the reserves in place, par-

4. Atlantic Ref. Co. v. Railroad Commission, 162 Tex. 274, 346 S.W.2d 801 (Tex. 1961) (Normanna Field) ; Halbouty v. Railroad Commission, 163 Tex. 417, 357 S.W.2d 364 (1962) (Port Acres Field) ; and Railroad Commission v. Shell Oil Co., 380 S.W.2d 556 (Tex.1964) (Quitman Field).

ticularly the wells in the deep and rich portions of the field. The contention before the United States Supreme Court is set out in the opinion:

"Only an allocation based upon acrefeet of sand or its equivalent would be a reasonable means of measuring the oil in place beneath respondent's leases; and any formula failing to do this takes respondent's property without due process of law." 310 U.S. at 578, 60 S.Ct. at 1023.

The lower federal courts struck down the order, but the Supreme Court reversed. It held that the proration of oil upon a fair basis was a matter for the administrative bodies and not for the judiciary. "A controversy like this always calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted." 310 U.S. at 580–581, 60 S.Ct. at 1024. The force of the opinion by Justice Frankfurter is magnified by the dissent which says that an order not based on in-place reserves amounts to a confiscation of property.

The above case was followed in Railroad Commission of Texas v. Rowan & Nichols Oil Co., 311 U.S. 570, 61 S.Ct. 343, 85 L.Ed. 358 (1941). The Court there said, "Thus it is that a production formula dependent on current reserves of oil in place—a consideration which greatly influenced the court below [in striking down the order] and was urged before us—contains elements of unfairness to wells on the edge of the field by disregarding the migration of oil from west to east." 311 U.S. at 574, 61 S. Ct. at 345.

In Railroad Commission v. Humble Oil & Ref. Co., 193 S.W.2d 824 (Tex.Civ.App. 1946, n. r. e.), the Commission's proration order for the Hawkins Field was based on a formula of 50 percent for the well and 50 percent for surface acreage. It was upheld as against many of the contentions advanced by Appellants here. Judge McClendon stated that "It has never been held that recoverable reserves constitutes the only factor to be considered in determining the validity of a proration order." 193 S.W.2d at 833. The evidence there was that a formula based only on reserves (acre-feet) would be impractical. That opinion was affirmed by the United States Supreme Court. Humble Oil & Ref. Co. v. Railroad Commission of Texas, 331 U.S. 791, 67 S.Ct. 1523, 91 L.Ed. 1820 (1947).

In the Port Acres case, it was proposed that the proration formula be based exclusively on net acre-feet. Part of the Commission's order appealed from stated: " 'The Commission further denied your [Halbouty's] application for an allocation formula based on net acre feet * * *.' " 357 S.W.2d at 367. While the Court struck down the particular formula with the large "per well" factor in it, the Court did not direct or even hint that a 100 percent acre-foot formula would be the only acceptable one. Instead, the Court held:

"We fully appreciate the thorny problem that the Commission has in this matter of proration among the hundreds of fields under their supervision with different characteristics and the diverse conflicting interests, views and opinions, but we are confident that with the trained personnel at their disposal a much nearer approximation can be made, giving to all parties an opportunity to produce a fair share of the minerals underlying the field with ratable allowables that will be more nearly equitable than appears in the case before us." 357 S.W.2d at 375–376.

The Quitman Field opinion pointed out (380 S.W.2d at 560) that the Commission has been directed by the Legislature to consider many factors (not just reserves). A proration statute specifically lists surface acres as a consideration. Article 6008, § 13 V.A.C.S.

■ This Court has taken the position that it is not the function of the Court to substitute itself for the Commission in determining the wisdom or advisability of a particular order. The power to regulate the production of oil and gas has been delegated by the Legislature to the Commission. The Court will not usurp that authority. It will not invalidate an order of the Commission because some other order might be thought by the Court to be better or more equitable. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 at 1029 (1942). The Commission's order will be sustained if it is reasonably supported by substantial evidence. Railroad Commission v. Mackhank Pet. Co., 144 Tex. 393, 190 S.W.2d 802 (1945). Our holding is that this order of the Commission is reasonably supported by substantial evidence.

### The Order Is Not Invalid as Compelling Unitization

■ Appellants Pickens et al. also here attack the order on the ground that it is an attempt on the part of the Commission to require forced pooling or unitization of the field. The argument is that the Commission is not authorized to force or require pooling; and it has sought to do so by indirection what it could not do directly. The assertion amounts to a charge that the Commission did not make a good faith independent effort to fairly prorate the oil but abdicated its governmental function to the field operators by blindly adopting their proposals. We are unable to agree with this assertion.

Appellants assert that there was not introduced before the Commission substantial evidence to support its order, particularly as to the water drive. The assertion is not a valid objection to the order. The record made before the Commission is not before us, and no attempt was made to introduce it into evidence. As this Court said in Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942), "Whether the agency heard sufficient evidence is not material. In fact, the evidence heard by the agency is not per se admissible upon the trial in the district court." 161 S.W.2d at 1030.[5]

■ There was no evidence of any purpose or design on the part of the Commissioners to adopt any formula which would force Pickens or anyone else to pool his or their production. No small tracts are involved. The units of production are 160 acres, and each well is capable of producing the oil under its tract. It is not asserted that anyone must pool his land with that of others to recover the minerals thereunder because of the cost of drilling a well, or for any other reason, as was pointed out as one of the grounds for the dissents in the Normanna and Port Acres cases. The fact that persons or corporations owning 88 or 92 percent of the production, after arguing among themselves, had been able to agree to the 50-50 formula which they recommended to the Commission, does not prove a relinquishment of authority by the Commission to anyone.[6a]

Appellants Pickens et al. say that this conclusion must be (conclusively) inferred as a fact from these circumstances:[6b]

The evidence is that soon after the discovery of this field, various operators recognized that ultimately a secondary recovery

---

5. Though both sides objected from time to time about what evidence the Commission heard, and the objections were sustained, there was in fact evidence from Appellants' witness Gruy that Phillips Petroleum Company had introduced evidence before the Commission as to the water drive.

6a. No question regarding the anti-trust laws is here raised or passed upon.

6b. Our disposition of this point makes it unnecessary to write upon the question of our jurisdiction to consider, on direct appeal, implied [or express] findings of fact made by the trial court. It has generally been regarded that this Court could consider only questions of law, and is without power to make or overturn findings of fact, except on the basis of "no evidence," "no substantial evidence," or the converse thereof.

program would be required to save great quantities of oil which would otherwise be left in the ground. Without such a program, they said, the field was expected to produce approximately 70 million barrels of oil. With a program of secondary recovery, an additional 130 million barrels could be recovered.

■ A secondary recovery program cannot be confined to particular tracts. It can be carried out with less complications and with greater ease if the entire field is unitized. But no one, under the present state of the Texas law, can be required to unitize his tract against his will, or to participate in a secondary recovery program.

Committees and subcommittees were formed among the operators to study the field and its problems. All the operators, including Appellant Pickens, were invited to attend the meetings. Mr. Gruy ultimately did attend meetings where he represented Pickens. The factual basis for a major exhibit prepared for this trial by Gruy was taken from the files of the committee, which files were open to him.

The various producers had different selfish interests and different problems of production. Some were over thin tracts and others, including Appellee Hunt Oil Company (which had more acre-feet of production than anyone in the field) and Appellant Pickens, were over thick tracts. Hunt Oil Company was elected to head the main committee.

The majority of the committee decided that it would, in the future, recommend to the Commission that the field be unitized; and steps were taken in the hope of ultimately bringing about a voluntary unitization. At the time of the hearing before the Commission on this proration order, owners representing 88 percent of the production, as a separate and independent matter, had agreed to a voluntary unitization of the field. Pickens et al. had not. At the time of the hearing and at the time of trial, the proposal for voluntary unitization had not been presented to the Commission. The Commission's 50-50 formula makes no reference to unitization.

The same unofficial committee argued within itself over the most desirable proration formula. There were different opinions as to the best formula. As a result of what was regarded as an equitable compromise within the committee, the 50-50 proration formula was recommended. In making the recommendation it considered the structure of the field, permeability, porosity, pressure, where the water levels were, water drive, as well as acre-feet and surface acres. Evidence to support that formula was presented to the court. Some of the exhibits had been originally prepared by members of the committee for the consideration of the committee. The committee thought the 50-50 formula would be desirable for a period of 13 years. Thereafter a 100 percent acre-foot formula would be desirable. At the time of the hearing before the Commission, the ownership of 88 percent of the field's production approved of the formula; and by the time of trial, 92 percent had approved.

Appellees assert that if this field is ultimately repressured by agreement of owners of 92 percent of the production, Pickens et al. will still be in an advantageous position on the structure and will be greatly benefited. They will be able to continue to produce on the basis of the Commission's proration order. Pickens will still recover, they say, more oil under the 50-50 formula, if the field is subject to secondary recovery, than is recoverable under his tracts by the ordinary or primary means.

The Commission did enter the 50-50 formula as the majority of the operators recommended. There is evidence that this formula will encourage unitization. From this, Appellants Pickens et al. say that as a matter of law the 50-50 order is invalid because it forces pooling. We cannot agree.

■ In promulgating a proration formula, the Commission is acting pro-

spectively. Its actions are legislative in character. Since the earliest days of the oil industry, it has been customary for interested people to recommend orders to the Commission. The Yates Field was operated by an advisory committee before the Commission was given the power to prorate production. See Standard Oil Co. v. Railroad Commission, 215 S.W.2d 633 at 634 (Tex.Civ.App.1948, n. r. e.). There the operators employed an expert to prepare rules, and requested the Commission to adopt them. It did.

■■ It is not improper for interested persons or groups to propose particular legislative orders. Similar action is common before the Legislature itself. It is unnecessary here for us to say that the courts are never interested in the motives of an administrative body while it is acting in a legislative capacity under delegated powers. Here there is simply no evidence of any sort of abdication on the Commission's part or a delegation of its powers to anyone. There is no evidence that the Commission disregarded the engineering and geological data available to it and entered the order just because some operators recommended it. The question is not one of unitization or pooling. That question was not before the Commission and is not before us. The question here is whether the order which the Commission entered, when tested by the usual rules, is or is not reasonably supported by substantial evidence. We have held that it is. It is a valid exercise of the police power of the Commission to protect correlative rights under our statutes.

### Evidence Adduced after Date of Commission's Order

■ Appellants Pickens et al. contend that the trial court erred in admitting evidence of tests made, or other evidence discovered, after the date of the Commission's proration order. They cite the familiar rule that the Commission's order is to be tested by the conditions as they existed at the time the Commission acted. Magnolia Pet.

Co. v. New Process Production Company, 129 Tex. 617, 104 S.W.2d 1106 (1937); Railroad Commission of Texas v. Magnolia Pet. Co., 130 Tex. 484, 109 S.W.2d 967 (1937); Cook Drilling Co. v. Gulf Oil Corp., 139 Tex. 80, 161 S.W.2d 1035 (1942).

The order in question was promulgated on March 6, 1963. Intervenor Hunt Oil Company, an appellee, tendered its Exhibit #1 which was based on reservoir conditions to August 28, 1963. It was a structural isopach map, "On Top of James [Lime] Porosity," and showed the portion of the field underlain by water. Exhibit #1 of Cities Service Oil Company was also an isopach map on top of the Fairway (James Lime) Field to show the area of the field underlain by water and the aquifer around the field. This exhibit was based on a map made in 1961 but which had been brought "up to date" down to August 1963. Hunt's Exhibits #2 and #3, objected to for the same reason, showed, down to August and November 1963, respectively, the cumulative oil production and the "water cut-percentage" (percentage of water produced per thousand barrels of oil) in particular wells. Part of the testimony of the witnesses Dixon, Latimer, and Kelly was based on these exhibits. There were other exhibits similarly objected to.

It was stipulated during the trial that "all geological or engineering data * * * offered by any expert witness shall not be objected to on the ground of hearsay evidence," or on the ground that it was not properly authenticated. Objection could be made on the grounds of materiality or relevancy. Appellants took the position that evidence of conditions, or evidence obtained, after March 3, 1963, was irrelevant and immaterial.

■ The trial court admitted the first of these exhibits with the following ruling:

"I will overrule the objection [of counsel for Pickens et al.] with the following qualification: That I will only consider it if it shows anything

that was in existence, or tends to show anything that was in existence, at the time of the order of the Commission, whether it was discovered later, or platted later, studied later, or the results showed later. * * *

"Now that may be a little complicated, but I felt that I must qualify it to that extent. The limitation in so far as information obtained, experiments and results of experiments made since the Railroad Commission order, is admissible in so far as it might show, or tend to show, what was actually in existence, or conditions in existence at the time of the Railroad Commission order, whether they were then known or not."

There was substantially this same ruling on the admissibility of other evidence of the same nature.

The trial court's ruling was correct. Lone Star Gas Co. v. State, 137 Tex. 279, 153 S.W.2d 681 at 700 (1941). Many of the basic "conditions" which were geologically in existence in the oil field at the time the Commission acted may have existed for a million years; and the fact that they were discovered, or evidence of the condition was adduced, after the Commission's order would not render the evidence inadmissible. It is, of course, possible for conditions to change within the field; and it would not be entirely fair to the Commission to judge its orders by conditions which have changed since its order. Here, however, the trial court admitted the geological evidence which showed, or which tended to show, what the conditions were as of the time of the order, and what the Commission might reasonably have anticipated to occur as a result of those conditions.

While no particular point has been made of it in our opinions, this Court has considered geologic evidence which was adduced or discovered after the entry of the Commission's order. In Railroad Commission v. Manziel, supra, for example, the order was dated August 15, 1960. This Court's opinion sets out the results of tests made thereafter on September 1, 1961. See 361 S.W.2d at 573. Similarly in the Port Acres case, the order was dated August 18, 1958. The Commission refused to reconsider the order on July 6, 1959. This Court in its opinion refers to evidence as to uncompensated drainage as of April 1, 1960 (357 S.W.2d at 371), and of tests made in October 1960 as to comparative production among wells (See 357 S.W.2d at 372, Footnote 1). As reflected by the majority and dissenting opinions in the Normanna case, the Bright & Schiff well which was under attack had not even been drilled, or the permit for its drilling issued, at the time the Commission issued its proration order for the field.[7] Yet the validity of the Commission's field-wide proration order turned in part on what that particular well would produce in the future compared to the in-place reserves which its lease was supposed to have.

In all of these proration cases, the Court has considered this type of evidence for its value in showing, or tending to show, what the conditions were when the Commission acted, and how they might reasonably be expected to develop in the future, even though the tests to verify, vel non, the existence of those conditions may have been conducted at some later date. In passing, it is noted that the tests here were made within a relatively brief time after the Commission's order.

7. 346 S.W.2d at 804. The proration orders were dated December 1957 and February 1958. 346 S.W.2d at 802. Bright & Schiff's permit to drill was dated December 1958. 346 S.W.2d at 816. There was considerable delay in the completion of the well because Atlantic Refining Company constructed a warehouse at the place where the driller needed to place his machinery. This resulted in injunctive litigation ending in this Court. Atlantic Ref. Co. v. Bright & Schiff, 321 S.W.2d 167 (Tex.Civ.App.1959, n. r. e). The estimates of future production appear in our Normanna opinion in 346 S.W.2d at 803 and 804.

### Admissibility of the Evidence of the Witness Pat Kelly

The defendant in the trial court, the Railroad Commission, tendered as its witness Mr. Pat Kelly to defend its position. Kelly qualified as an expert in the field of petroleum engineering. His testimony was objected to (1) because Kelly had been the trial examiner who took the testimony for the Commission when this matter was before the Commission; (2) because testimony received in the Commission's hearing is not *per se* admissible in the trial before the court, and (3) part of Kelly's testimony was based on tests made after the date of the Commission's order. This last objection, having been considered above, will not be again noticed.

As to the objection that Kelly had been an examiner and hence was not competent to testify, Appellants Pickens et al. had no authorities to present to the trial court, and they cite none here. In ruling upon the admissibility of Kelly's testimony, the trial court said that he would consider Kelly's testimony which was based upon what Kelly knew as an expert. With regard to the second objection, the court said, "I will not consider over objection matters which are based solely on the ground that it [the evidence] was before the Commission."

The fact that Kelly was an examiner for the Railroad Commission in this matter would not *per se* disqualify him as a witness for the Commission. The Commission, of course, is entitled to defend its order; and if Kelly otherwise qualified as an expert, he could testify to what he knew as an expert. There is precedent in this regard. In the "Flare Gas" case, Railroad Commission v. Sterling Oil and Ref. Co., 147 Tex. 547, 218 S.W.2d 415 (1949), this Court quoted the testimony of but two witnesses. They were Railroad Commissioners Murray and Thompson. Commissioner Murray testified as a petroleum engineer. Commissioner Thompson simply testified as a Commissioner in defense of the Commission's order. Based on the testimony of these two witnesses, this Court held the order to be reasonably supported by substantial evidence.

In other cases involving the Commission's orders, employees of the Commission have testified.[8] Similar holdings have been made with regard to permitting a Commissioner in a condemnation case to testify as an expert upon the trial as to the value of the property taken. City of Houston v. Schorr, 231 S.W. 2d 740 (Tex.Civ.App.1950, wr. dism'd); Schwab v. County of Bexar, 366 S.W.2d 952 (Tex.Civ.App.1963, n. r. e.). Without writing on the point, this Court considered such evidence in its opinion in Texas Electric Service Co. v. Campbell, 161 Tex. 77, 336 S.W.2d 742 at 743 (1960).

Accordingly, we hold that the trial court did not err in admitting the evidence complained of. As above indicated, we also hold that the proration order in question for the Fairway (James Lime) Field is reasonably supported by substantial evidence and is valid. The judgment of the trial court is affirmed.

8. Standard Oil Company of Texas v. Railroad Commission, 215 S.W.2d 633 (Tex.Civ.App. 1948, n. r. e.), involving the proration of oil in the Yates field, where the Court's opinion sets out and comments on the testimony of Mr. Jack Baumel, then the Director of the Commission's Oil and Gas Division; Railroad Commission v. Humble Oil & Ref. Co., 193 S.W.2d 824, 829, 831 (Tex.Civ.App. 1946, n. r. e.), where Mr. Baumel again testified; and Phillips Petroleum Co. v. Railroad Commission, 341 S.W.2d 523 (Tex.Civ.App.1960, n. r. e.).