TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00329-CV






Exxon Corporation, Appellant



v.



Railroad Commission of Texas and Oryx Energy Company, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT


NO. 97-07650, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING







 Exxon Corporation sued the Railroad Commission of Texas for judicial review of
a final order issued by the agency in a contested case. Oryx Energy Company intervened in the
cause. Exxon appeals from a trial-court judgment affirming the Commission order. We will
affirm the judgment.


THE CONTROVERSY


 Oryx's Brown Altman Acct 4 Unit ("the Oryx Unit") is a 160-acre unit, in Winkler
County, that produces natural-gas from the Emperor (Devonian) Field. The Oryx Unit is
composed of two tracts. The first is a forty-acre tract that was subdivided from a larger tract in
1947; the second is a 120-acre tract that was created and pooled with the forty-acre tract in 1958. 
Before such pooling, the Commission adopted in 1956 the Emperor (Devonian) Field Rules. The
field rules fixed a well-density ratio of one well per 320 acres. The two tracts, individually and
collectively, contain only half of the 320 acres required for well-density purposes. The unit has
had only one well, "Well No. 5," since its creation.

 The forty-acre tract is a "legal subdivision," in Commission parlance, because it
resulted from the subdivision of a larger tract in 1947 before discovery of oil and gas in the
area--it could not have been created, therefore, to circumvent Commission density and spacing
rules. And because the tract is a legal subdivision, there attaches to the mineral owner a right to
a reasonable opportunity to recover a fair share of the underlying minerals, as discussed hereafter. 
The 120-acre tract, on the other hand, is known as a "voluntary subdivision" because it was
created and pooled with the forty-acre tract after the Commission adopted the Emperor (Devonian)
Field Rules.

 The foregoing classifications have important consequences under the Commission's
statewide density rule--Rule 38. See 16 Tex. Admin. Code § 3.38 (1998) ("Rule 38"). (1) The most important are these: For a legal subdivision having substandard acreage (less than 320 acres in 
this instance), no exception to density requirements is necessary "for the first well on the . . .
drillsite tract of a pooled unit." Rule 38(d)(1). In the case of a voluntary subdivision having
substandard acreage, on the other hand, an exception to the density requirements must be obtained
and it may be granted only to prevent waste. Rule 38(d)(2).

 After adopting the Emperor (Devonian) Field Rules in 1956, the Commission issued
in the following year a permit to drill Well No. 5, the first well on the forty-acre tract and the first
on the unit. Well No. 5 was completed in the Emperor (Devonian) Field and produced for a
number of years before it began to deteriorate with an attendant decline in production. Workovers
in 1972 restored production until 1995 when production began to decline rapidly. Oryx applied
for a Commission permit to drill a new well, "Well No. 6," off the forty-acre tract and 1,267 feet
from Well No. 5. Oryx contended this location and distance were necessary to avoid the water
encroachment that had caused the deterioration in Well No. 5. Exxon appeared in the Commission
proceeding that followed the application and opposed issuance of the permit. While the application
was pending, Oryx attempted unsuccessfully to rehabilitate Well No. 5; and in the course of the
agency proceeding, Oryx amended its application to request a permit to drill Well No. 6, on the
forty-acre tract, as a replacement for Well No. 5.

 After a contested-case hearing, the Commission denied Oryx's application to drill
a new well off the forty-acre tract but granted the application to drill Well No. 6, as a replacement
well, on the forty-acre tract. The Commission based its decision on the following findings of fact
and conclusions of law:


Findings of Fact



* * *



7. There are no unusual geological conditions or structures under the Oryx Unit
that are different from adjacent parts of the Emperor (Devonian) Field.


8. Substantially all of the recoverable . . . gas under the Oryx Unit can be
recovered by wells at regular locations under applicable field rules.


9. Existing Well No. 5 has suffered mechanical difficulties which [Oryx] has
made reasonably diligent efforts to rectify.


 [The efforts are here specified].


10. As a result of its current mechanical problems and the depleted state of the
Emperor (Devonian) Field, existing Well No. 5 will not give the mineral
interest owners a reasonable opportunity to recover their fair share of
hydrocarbons from the Emperor (Devonian) Field.


 [Subsidiary findings are here set forth].


11. Because of the likelihood of water encroachment problems in the immediate
vicinity of Well No. 5 on the Oryx Unit as a result of water communication
from higher horizons, potential well locations less than 100 feet from existing
Well No. 5 are unlikely to allow applicant to recover its fair share of reserves
from the Oryx Unit.


Conclusions of Law



* * *



3. The substandard Oryx Unit is a voluntary subdivision which may not be
granted a permit for a well except as an exception to Statewide Rule 38 to
prevent waste.


4. The 40-acre tract on which existing Well No. 5 . . . is located is a legal
subdivision.

5. Approval of the requested permit to drill a well at the proposed location [off
the forty-acre tract] is not necessary to give the owners of the Oryx Unit a
reasonable opportunity to recover their fair share of hydrocarbons in the
applied-for fields underlying the unit, or the equivalent in kind.


6. Approval of the requested permit to drill a well at the proposed location [off
the forty-acre tract] is not necessary to prevent the loss of a substantial
volume of hydrocarbons in the applied-for fields.


7. An exception to Statewide Rule 38 for a well at the applied-for location [off
the forty-acre tract] is not necessary to prevent confiscation or to prevent
waste.


8. Applicant is entitled to replace existing Well No. 5 on the Oryx Unit with a
new well drilled at a location as close as reasonably practical to Well No. 5,
but in no event more than 200 feet from the permitted location of Well No.
5.



 Exxon raises four issues on appeal, as follows:  (1)  Whether the Rule 38 exception
granted by the final order violates both Commission rules and statutory authority; (2)  Whether
the Commission's decision to grant a Rule 38 exception is arbitrary or capricious; (3)  Whether
the Commission's order granting a Rule 38 exception is not supported by substantial evidence; and
(4) Whether the trial court erroneously excluded a portion of the agency record from the
evidence, which exclusion resulted in harm.

 The foregoing issues are somewhat intermingled in Exxon's argument and we will
therefore discuss Exxon's several contentions under the headings indicated below.


ACTS OUTSIDE THE SCOPE OF AGENCY AUTHORITY


 Exxon contends the Commission, in issuing the permit for Well No. 6, acted
without authority because: the 160-acre Oryx Unit encompasses substandard acreage (Rule
38(a)(4)); the Unit is a voluntary subdivision (conclusion of law 1); an exception for voluntary
subdivisions having substandard acreage is authorized only to prevent waste (Rule 38(d)(2), (f));
and Oryx failed to prove the ultimate fact of waste (findings of fact 7 and 8; conclusions of law
6 and 7).

 The foregoing rationale fails to account for the dual aspect of the Commission's
final order. The order expressly denies Oryx's application to drill Well No. 6 off the forty-acre
tract, as an exception under Rule 38, and expressly grants the application to drill Well No. 6 on
the forty-acre tract as a replacement well for Well No. 5, requiring in the permit that Well No.
6 be located as close as practical to Well No. 5 and not more than 200 feet from it. Exxon replies
that nothing in Rule 38 purports to create an exception for replacement wells; and, the omission
thus implies that such wells are subject to the same Rule 38 criteria applicable to all wells having
substandard acreage resulting from a voluntary subdivision. We disagree.

 Rule 38(d)(1) states expressly that "[a]n exception to the minimum density provision
is not required for the first well in a field . . . on . . . the drillsite of a pooled unit." Rule 38(d)(1)
(emphasis added). The proposed Well No. 6 satisfies Rule 38(d)(1), however, only if one accepts
that the term "first well" is sufficiently flexible in context to allow for a constructive as well as
a literal meaning. Well No. 5 was, of course, the literal "first well" on the forty-acre tract, and
Well No. 6 comes within the term only in the constructive sense applied by the Commission: Well
No. 6 would be the functional equivalent of Well No. 5 because the latter would cease production;
and Well No. 6 would be the legal equivalent of Well No. 5 because, like its predecessor, it was
necessary to secure the mineral owner's reasonable opportunity to recover a fair share of the
minerals. See Railroad Comm'n v. Williams, 356 S.W.2d 131, 135-36 (Tex. 1961); Gulf Land
Co. v. Atlantic Ref. Co., 131 S.W.2d 73, 80 (Tex. 1939). Did the Commission exceed its
authority in applying a constructive meaning to the term "first well?"

 The Commission administers, in a complex legal and technical environment, the
provisions of numerous regulatory statutes pertaining to oil and gas wells and their operation. 
These statutes aim at the conservation of oil and gas resources, the protection of correlative rights,
and the prevention of waste and pollution. It is not suggested that the interpretation the
Commission placed on Rule 38(d)(1) renders it inconsistent with the objectives of any such statute. 
Exxon claims instead that the Commission was simply bound to apply a literal meaning of the term
"first well" and was powerless to apply a constructive or non-literal meaning.

 The ultimate issue on judicial review of an agency's interpretation of its own rule
is whether the agency interpretation is plainly erroneous or inconsistent with the words of the rule. 
See United States v. Larionoff, 431 U.S. 864, 872 (1977); Public Util. Comm'n v. Gulf States, 809
S.W.2d 201, 207 (Tex. 1991). If not, the agency acted within its discretion in the meaning it
assigned to its rule. The agency interpretation here is not inconsistent with the words of the rule
if "first well" is understood in the constructive sense applied by the Commission; the
interpretation is of course, inconsistent with the text of the rule if "first well" is understood only
in a literal sense. The question reduces then to whether the Commission's interpretation is plainly
erroneous. The owner's right to a reasonable opportunity to recover a fair share is a
constitutionally and statutorily protected right. Assigning a literal meaning to the term "first well"
would nullify the right in this case, under the Commission's determinations, while a constructive
meaning preserves the right. "[T]here is no right by statute or regulation under a statute, to take
the property of one person and give it to another." Robert E. Hardwicke and M. K. Woodward,
Fair Share and the Small Tract in Texas, 41 Tex. L. Rev. 75, 93-94 (1962) (emphasis in original);
cf. State v. Dyer, 200 S.W.2d 813, 815 (Tex. 1947) (courts will not follow letter of statute when
doing so leads away from intent and purpose of legislature, and to conclusions inconsistent with
general purpose of statute). We hold the Commission acted within its discretion. 

 We believe the foregoing answers sufficiently Exxon's corollary contention that the
Commission's findings of fact and conclusions of law are inconsistent on their face, and the
corollary contention that the agency was bound to comply with the provisions of its own Rule 38
but failed to do so.

 Exxon contends the 200-foot limitation, fixed by the Commission in its conclusion
of law number eight, is not supported by substantial evidence; consequently, the Commission was
not authorized to permit the drilling of a replacement well at that distance from Well No. 5. 
Conclusion of law number eight and finding of fact number twelve are related. In the latter, the
Commission determined that a well located less than 100 feet from Well No. 5 would likely not
allow the Oryx Unit owner a reasonable opportunity to recover a fair share because of water
problems expected within that distance. In conclusion of law number eight, the Commission then
fixed the maximum distance for the replacement well at 200 feet from Well No. 5. These
determinations derive from the opinion testimony of an expert witness, evidence regarding the
history of water problems associated with Well No. 5, and certain documents introduced in
evidence and explained by the witness.

 The expert witness related Oryx's recent experience with a well on an adjacent tract
that also produced from the Emperor (Devonian) Field. That well experienced the same water
problems as did Well No. 5 and Oryx drilled on the adjacent tract a replacement well 113 feet
from the problem well. Water problems encountered with the replacement well caused Oryx to
shut it down. From this experience, the witness concluded that Oryx had made a poor decision
in locating the well only 113 feet from the replaced well and that replacement wells in the vicinity
should be located "further away."

 In the Commission's final order, the agency deleted from the proposal for decision
the examiner's recommended finding of fact number eleven, and his conclusion of law number
eight. These declared as follows:


11. Any water encroachment problems in the immediate vicinity of Well No. 5
. . .  are minor and are the result of water communication from higher horizons as
a result of [Oryx's] failure to maintain the mechanical integrity of Well No. 5.


* * *



8.  [Oryx] is entitled to replace existing Well No. 5 . . . with a new well drilled at
a location as close as reasonably practical to Well No. 5, but in no event more than
100 feet from the permitted location of Well No. 5.



In lieu of these deleted determinations, the Commission substituted its own finding of fact number
eleven and conclusion of law number eight, set out verbatim above. Exxon assails the
Commission's substitution of 200 feet for the examiner's 100 feet distance in the absence of any
evidence specifically supporting the 200-foot distance.

 Exxon's substantial-evidence arguments raise several different issues. We should
state first that we review the Commissioners' findings of fact and conclusions of law, not those
recommended by the examiner in his proposal for decision. Those recommendations do, however,
constitute a part of "the record as a whole" that is the object of judicial review concerning
substantial-evidence questions. See Tex. Gov't Code Ann. § 2001.174(2)(E) (West 1998). 
Accordingly, an examiner's recommendations may be considered in light of the pertinent evidence
and are only entitled to such value as they intrinsically command when agency decisionmakers
depart from them. See generally 2 Davis and Pierce, Administrative Law Treatise § 11.2, at 178-82 (1994).

 There is in the body of evidence nothing that substantiates specifically the 200-foot
distance fixed in the Commission's final order. The expert witness' testimony was clear, direct,
and unequivocal, however, on the likelihood that water problems in a replacement well in the
vicinity would be encountered at a distance of 113 feet or less. His testimony was uncontradicted. 
Nothing in the pertinent evidence, as we understand it, renders his opinion improbable and nothing
raises an issue as to his credibility. Cf. Fuel Distributors, Inc. v. Railroad Comm'n, 727 S.W.2d
56, 61 (Tex. App.--Austin 1987, writ ref'd n.r.e.). Yet the examiner in his proposal for decision
stated his opinion that the witness' testimony was "speculative." This statement, in these
circumstances, appears to reflect mainly the idea that a good deal of testimony involving
subterranean matters is perforce uncertain to a degree.

 The proposal for decision indicates without question that the examiner fixed the
distance at 100 feet because he believed himself bound to do so under the terms of a 1961
Commission memorandum pertaining to replacement wells. The Commission's final order, fixing
the distance at 200 feet, indicates of course that the agency disregarded that element of the 1961
memorandum. 

 In our review of the matter, two important considerations arise. The first is that
the distance figures, whether 100 feet or 200 feet, are not "adjudicative" facts for which one
expects perfectly explicit support in the body of evidence; they are, instead, "legislative facts" that
the Commission was authorized to determine based on its judgment and expertise in light of what
the evidence showed with respect to the general situation involving water problems in the vicinity
of Well No. 5. The Commission was required in the circumstances to fix some distance, and
nothing in the evidence suggests that the agency abused its discretion in the choice it made. See
2 Davis and Pierce, supra, § 10.6, at 158-59; Bernard Schwartz, Administrative Law § 5.7, at
213-15 (1984). The second consideration is that the Commission was not required to be absolutely
accurate in calculating the exact point where water problems would in fact be encountered. The
agency was entitled to a reasonable margin for error. Railroad Comm'n v. Shell Oil Co., 161
S.W.2d 1022, 1027 (Tex. 1942). We find in the record nothing that indicates that the change from
100 feet to 200 feet contained an unreasonable margin of error. We hold the Commission
determined the matter within the evidence and its authority.

 Because it is clear from the record that the Commission did not base its decision
on the requirements contained in the 1961 memorandum, we need not discuss Exxon's argument
that the replacement-well requirements set forth therein were not satisfied.

 Exxon contends the Commission lacked authority to issue the permit under Rule
38 because as a matter of law the forty-acre tract vanished as a legal subdivision when it was
pooled with other acreage in 1958. Exxon reasons that the forty-acre tract ceased to exist as a
legal subdivision because, at common law, pooling results in cross-conveyances of mineral
interests among the owners of the pooled acreage, so that all of them acquire an undivided interest
in the resulting unit in proportion that their contribution of acreage bears to the acreage of the
entire unit. See Montgomery v. Rittersbacher, 424 S.W.2d 210, 213 (Tex. 1968); Rule 38(d)(3). 
We believe Rule 38(d)(3) is not applicable because there has been no attempt to divide the 160 acre
Oryx Unit. Moreover, Exxon's theory is rejected by Rule 38(d)(1), under which a permit was
issued to drill Well No. 6 as a replacement well. Rule 38(d)(1) contemplates for regulatory
purposes the continued existence of a drillsite tract, such as the forty-acre tract, after it is pooled. 
The rule states that "[a]n exception . . . is not required for a first well . . . on the drillsite tract
of a pooled unit." (emphasis added).

 Exxon contends next that the Commission acted outside the scope of its authority
when it issued the permit because


there is no evidence in this record to quantify whether there is or is not confiscation
as to the 40-acre tract. All of the evidence relates to the 160-acre Oryx Unit. If
it is the 40-acre tract that is entitled to protection from confiscation, then some
findings of fact must be made as to the mineral owners' fair share of hydrocarbons
beneath the 40-acre tract, and the ability or inability of the existing well to recover
those hydrocarbons. There are no such findings of fact in this record.



(emphasis in original).

 The Commissioner's finding of fact eleven is that Well No. 6 is necessary to allow
Oryx a reasonable opportunity to recover its fair share under the Oryx Unit. That right belongs
to the mineral owner, not to the physical acreage. It is undisputed that Well No. 6 will be the sole
producing well on the unit, just as Well No. 5 is presently. We do not understand, in light of
these undisputed facts, the relevance of the evidence and findings for which Exxon contends.


ABUSE OF DISCRETION AND DISCRIMINATION


 Exxon argues that the Commission, by granting Oryx an exception under Rule 38,
disregarded the provisions of Rule 38 applicable to exceptions and fashioned a unique exception
for Oryx not available to other applicants who must comply with those provisions. We reiterate
that the Commission order states on its face that it denied Oryx's application for a permit based
on an exception to Rule 38 but issued the permit based on Oryx's demonstrated entitlement to a
replacement well under Rule 38(d)(1), which does not require an exception. It does not appear
that Rule 38(d)(1) will be construed differently in like circumstances involving other applicants.


SUPPLEMENTATION OF THE AGENCY RECORD


 Exxon moved in the trial court to supplement the agency record by adding two
tendered transcriptions of as many public meetings. At these meetings, the Commissioners
discussed with the hearings examiner his proposal for decision, the evidence referred to therein,
the 1961 memorandum, the meaning of various provisions of Rule 38, and the possible terms of
a final order. The second meeting was actually a continuation of the first held two weeks before. 
Counsel for both Exxon and Oryx gave their views and responded to questions at the second
meeting. The transcription of the first meeting does not indicate whether counsel were present. 
Presumably they were. See Tex. Gov't Code Ann. § 2001.061(a) (West 1998). The trial judge
overruled Exxon's motion to supplement the agency record, which action Exxon contends was
reversible error. It is not contended that the transcriptions reflect any procedural irregularities in
the agency proceeding. Id. § 2001.175(e).

 The Commission was required to include in the record of agency proceedings, and
transmit to the reviewing court, "each . . . report by the officer presiding at the hearing," a
hearings examiner in this instance, together with "all staff memoranda or data submitted to or
considered by the hearing [examiner] or members of the agency who are involved in making the
decision." Id. § 2001.060(6), (7), .175(b). Exxon contends the transcriptions of the two public
meetings amount to a "report," "memoranda," or "data."

 The "report by the officer presiding at the hearing," referred to in section
2001.060(6), refers primarily to the written proposal for decision required by section 2001.062
of the Texas Government Code. See id. § 2001.062. The expression in section 2001.060(7)
regarding "all staff memoranda or data" refers to any communication from agency staff to agency
decisionmakers regarding issues of fact, law, or policy. The purpose of section 2001.060(6) and
(7) is to enable the parties and their counsel to participate meaningfully in the contested case by
assuring that they know the complete and true grounds upon which the agency decision will be
made, thereby reducing the chance that a decision might be made on inadequate or inaccurate
information. See 1 Cooper, State Administrative Law, 428-29 (1965). This is one purpose behind
the proposal-for-decision practice itself, which gives the parties a right to receive service of a copy
of the proposal for decision before a final decision is made, and an opportunity to challenge the
proposed decision by filing exceptions and briefs. See Tex. Gov't Code Ann. § 2001.062(a)-(d)
(West 1998); 2 Cooper, supra, at 461.

 The transcriptions indicate that the hearing examiner did not communicate to the
Commissioners, in the two public meetings, anything not otherwise contained in the record or the
proposal for decision itself. We hold there was not error in the trial judge's overruling Exxon's
motion.

 Finding no error, we affirm the trial-court judgment.



 

 John E. Powers, Justice

Before Justices Kidd, Patterson and Powers*

Affirmed

Filed: March 18, 1999

Publish




* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. For the reader's convenience in understanding our opinion, we set out below the provisions
of Rule 38 invoked by the parties.


(a)  Definitions. The following words and terms, when used in this section, shall
have the following meanings, unless the context clearly indicates otherwise.


* * *



 (4)  Substandard acreage--Less acreage than the smallest amount established for
standard or optional drilling units.


* * *



(b)  Density requirements.


 (1)  General prohibition. No well shall be drilled on substandard acreage except
as hereinafter provided.


* * *



(d)  Applications involving the voluntary subdivision rule.


 (1)  Density exception not required. An exception to the minimum density
provision is not required for the first well on a lease, pooled unit, or unitized tract
composed of substandard acreage, when the lease, or the drillsite tract of a pooled
unit or unitized tract:


 (A)  took its present size and shape prior to the date of attachment of the
voluntary subdivision rule (§ 3.37(g) of this title (relating to Statewide Spacing
Rule));


 (B)  took its present size and shape after the date of attachment of the
voluntary subdivision rule (§ 3.37(g) of this title (relating to Statewide Spacing Rule))
and was not composed of substandard acreage in the field according to the density
rules in effect at the time it took its present size and shape.


 (2)  Density exception required. An exception to the density provision is
required, and may be granted only to prevent waste, for a well on a lease, pooled
unit, or unitized tract that is composed of substandard acreage and that:


 (A)  took its present size and shape after the date of attachment of the
voluntary subdivision rule (§ 3.37 of this title (relating to the Statewide Spacing
Rule)); and


 (B)  was composed of substandard acreage in the field according to the
density rules in effect at the time it took its present size and shape.


 (3)  Division after joinder or unitization. If two or more separate tracts are
joined or unitized for oil, gas, or geothermal development and accepted by the
commission, the joined or unitized tracts may not thereafter be divided into the
separate tracts with the rules of the commission applicable to each separate tract, if
the division results in any tract composed of substandard acreage at the time of
division [except after notice, an opportunity for hearing or waiver, and commission
approval].


* * *



(f)  Exceptions to density provisions authorized. The Commission, or Commission
designee, in order to prevent waste or, except as provided in subsection (d)(2) of this
section, to prevent the confiscation of property, may grant exceptions to the density
provisions set forth in this section. Such an exception may be granted only after
notice and an opportunity for hearing.



ular">* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. For the reader's convenience in understanding our opinion, we set out below the provisions
of Rule 38 invoked by the parties.


(a)  Definitions. The following words and terms, when used in this section, shall
have the following meanings, unless the context clearly indicates otherwise.


* * *



 (4)  Substandard acreage--Less acreage than the smallest amount established for
standard or optional drilling units.


* * *



(b)  Density requirements.


 (1)  General prohibition. No well shall be drilled on substandard acreage except
as hereinafter provided.


* * *



(d)  Applications involving the voluntary subdivision rule.


 (1)  Density exception not required. An exception to the minimum density
provision is not required for the first well on a lease, pooled unit, or unitized tract
composed of substandard acreage, when the lease, or the drillsite tract of a pooled
unit or unitized tract:


 (A)  took its present size and shape prior to the date of attachment of the
voluntary subdivision rule (§ 3.37(g) of this title (relating to Statewide Spacing
Rule));


 (B)  took its present size and shape after the date of attachment of the
voluntary subdivision rule (§ 3.37(g) of this title (relating to Statewide Spacing Rule))
and was not composed of substandard acreage in the field according to the density
rules in effect at the time it took its present size and shape.


 (2)  Density excepti