NO. 07-08-00376-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

OCTOBER 5, 2010

THE PETROLEUM SYNERGY GROUP, INC., APPELLANT

v.

OCCIDENTAL PERMIAN, LTD., APPELLEE

FROM THE 154TH DISTRICT COURT OF LAMB COUNTY;

NO. 16386; HONORABLE FELIX KLEIN, JUDGE

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**OPINION**

This is an oil drainage case. The Petroleum Synergy Group, Inc. (PSG) owns an overriding royalty interest in a lease in Lamb County operated by Occidental Permian, Ltd. (OPL). PSG filed suit against OPL alleging OPL breached the implied covenant to prevent substantial drainage of the leasehold. The jury did not find the occurrence of substantial drainage and the trial court rendered a take-nothing judgment in favor of OPL. On appeal, PSG argues it proved substantial drainage as a matter of law and the trial court reversibly erred by two evidentiary rulings. For the reasons that follow, we will affirm.

Background

The geology of the Anton-Irish (Wolfcamp) Field features two anticlines, referred to as the eastern and western.[1] The parties' dispute involves the production of oil from the western anticline. There OPL operates the one-quarter section Snitker lease. PSG owns an approximate 5.5 percent overriding royalty interest in lease production. OPL also owns two leases immediately north of the Snitker, the Roach and Stephenson leases, each containing roughly eighty acres. PSG owns no interest in the Roach or Stephenson leases.

The Texas Railroad Commission adopted temporary field rules for the Anton-Irish (Wolfcamp) Field in September 2001. The field rules called for eighty-acre proration units, a minimum distance of 467 feet separating a well from the nearest lease line, and a maximum daily oil allowable of 400 barrels for a well on an eighty-acre proration unit.

Another company, Devon Energy Corporation, operates its Lancaster lease, lying immediately east of OPL's Snitker lease. Devon completed its Lancaster No. 1 well, located 467 feet east of the line dividing the Lancaster and Snitker leases, in December 2001. In January 2002, OPL began drilling its first well on the Snitker lease, the Snitker No. 1. The well site was 467 feet west of the east Snitker lease line. Snitker No. 1 was

---

[1] An anticline is "[a] subsurface, geological structure in the form of a sine curve; that is, the formation rises to a rounded peak." 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law, Manual of Terms 49 (Patrick H. Martin & Bruce M. Kramer eds., 1998). "[A]n arch of stratified rock in which the layers bend downward in opposite directions from the crest." Merriam-Webster's Collegiate Dictionary 54 (11th ed.). *See Texaco, Inc. v. R.R. Comm'n,* 583 S.W.2d 307 (Tex. 1979); *Pickens v. Railroad Commission of Tex.,* 387 S.W.2d 35 (Tex. 1965) (both describing oil-producing formations underlying anticlines).

completed in February 2002 as an oil well producing at the maximum allowable rate, 400 barrels of oil per day.

In April 2002, Devon completed its Lancaster No. 2 well, north of the Lancaster No. 1 but also located 467 feet from the Snitker lease line. OPL promptly offset Devon's well by drilling its Snitker No. 2, located due north of the Snitker No. 1. When completed in May 2002, Snitker No. 2 also produced 400 barrels of oil per day.

On the Roach lease, OPL completed the Roach No. 1 as an oil well during July 2002. The surface location of the well is 132 feet north of the Snitker lease line with a bottom hole location 45 feet from the Snitker lease line. On the Stephenson lease, OPL completed the Stephenson No. 1 as an oil well during November 2002. The surface location of the well is 136 feet north of the Snitker lease line with a bottom hole 37 feet from the Snitker lease line.

To drill the Roach No. 1 and Stephenson No. 1 wells closer than 467 feet from the Snitker lease line, OPL applied for and obtained exceptions under the Railroad Commission's Rule 37.[2] Because OPL also was the operator of the Snitker lease, it was the only party entitled to notice of OPL's requested exceptions, under the terms of Rule 37.

An internal OPL document, dated in 2005, lists each of the company's wells producing from the western anticline, together with certain information for each well. Among the information is the company's estimate of the percentage of the oil originally

---

[2] 16 Tex. Admin. Code § 3.37(a)(1) (Lexis 2009) (Tex. R.R. Comm'n, Statewide Spacing Rule).

3

in place each well eventually would produce.  According to the estimates, the two Snitker wells would produce no more than 56 percent of the oil originally in place but the Roach No. 1 would produce as much as 195 percent, and the Stephenson No. 1 as much as 285 percent, of the oil originally in place.

PSG brought suit, alleging OPL breached the implied covenant to protect the Snitker lease against drainage by the Roach and Stephenson wells.  The jury disagreed, finding no substantial drainage of the Snitker.  The trial court rendered judgment that PSG take nothing and denied the motion of PSG for judgment notwithstanding the verdict.  This appeal followed.

Analysis

Issues

Through three issues PSG argues: (1) it proved substantial drainage of the Snitker lease as a matter of law; (2) the trial court reversibly erred by instructing the jury to disregard PSG's testimony in rebuttal to a defensive theory of OPL; (3) the trial court reversibly erred by allowing an OPL expert to render a previously undisclosed opinion.

*Whether PSG made conclusive proof of substantial drainage*

PSG first asserts it established substantial drainage as a matter of law.  A claim for breach of the covenant to protect against drainage of the lease requires the plaintiff to prove substantial drainage and that a reasonable and prudent operator would have acted to prevent the substantial drainage. *Amoco Production Co. v. Alexander,* 622

4

S.W.2d 563, 568 (Tex. 1981); *Grayson v. Crescendo Res., L.P.,* 104 S.W.3d 736, 740

(Tex.App.--Amarillo 2003).  Here, in its first question to the jury, the court inquired:

> "Do you find from a preponderance of the evidence that substantial drainage of oil or gas has occurred from the Snitker lease in the Anton-Irish (Wolfcamp) Field?"

The court defined "substantial drainage" as "the drainage of a sufficient quantity of oil

that would cause a reasonably prudent operator, with the expectation of making a

reasonable profit, to take action to protect it from that drainage."  The jury responded

"no" to the question.  Because the remaining questions submitted were conditioned on

an affirmative response to question one, the jury made no further answers.

A party attacking the legal sufficiency of an adverse jury finding on an issue on

which the party bore the burden of proof must demonstrate all vital facts in support of

the issue were established as a matter of law.  *Dow Chemical Co. v. Francis,* 46 S.W.3d

237, 241 (Tex. 2001) (per curiam).  The analysis requires we first examine the record in

the light most favorable to the verdict for some evidence supporting the jury's finding,

crediting evidence favoring the finding if a reasonable fact finder could and disregarding

contrary evidence unless a reasonable fact finder could not.  *City of Keller v. Wilson,*

168 S.W.3d 802, 807, 822 (Tex. 2005).  Some evidence, meaning more than a scintilla,

exists when the evidence "rises to a level that would enable reasonable and fair-minded

people to differ in their conclusions."  *Merrell Dow Pharms., Inc. v Havner*, 953 S.W.2d

706, 711 (Tex. 1997).  If, however, no evidence appears to support the finding, we then

examine the entire record to determine whether the contrary proposition is established

as a matter of law.  *Francis,* 46 S.W.3d at 241; *Raw Hide Oil & Gas, Inc. v. Maxus*

*Exploration Co.,* 766 S.W.2d 264, 276 (Tex.App.--Amarillo 1988, writ denied). A proposition is established as a matter of law when a reasonable fact finder could draw only one conclusion from the evidence presented. *City of Keller,* 168 S.W.3d at 814-16; *Brent v. Field,* 275 S.W.3d 611, 619 (Tex.App.--Amarillo 2008, no pet.).

The Anton-Irish (Wolfcamp) Field was described in testimony as a water-drive field.[3] Terry Dean Payne, a reservoir engineer, testified for OPL. He categorized the field as a "very strong water drive field." According to Payne, impermeable shale overlies the oil-bearing rock in the anticline. Above the granite "basement" rock, a large aquifer underlies the eastern and western anticlines. Between the aquifer and the oil-bearing rock lies a transition zone of oil and water.

Payne told the jury that the weight of the mile-and-a-half of rock resting on top of the reservoir pressurized the reservoir fluids to 2,600 pounds per square inch. The volume of oil in the reservoir is small compared to the aquifer, such that production of oil does not cause a significant change in reservoir pressure. Thus, Payne explained, production of four million barrels of oil from the western anticline had caused a pressure decline of only about sixty pounds per square inch. He said that as oil is produced from the wells, "the aquifer advances up and pushes that oil to the top of the structure so the oil is essentially replaced with water from underneath."[4]

---

[3] The dynamics of oil production in a water-drive field are described in *Alexander,* 622 S.W.2d at 565-66. *See also Pickens,* 387 S.W.2d at 40-42 (containing descriptions of effect of water drive on oil production).

[4] For demonstrative purposes, the trial court allowed the jury to view a video animation of a water drive pushing oil in an oil field upward to a well bore. By

Payne distinguished the pattern of hydrocarbon drainage typically seen in a "depletion drive" reservoir from that in a reservoir with a water drive present. With the former, especially when the hydrocarbon-bearing rock has good permeability, fluids typically flow toward the wellbore in a radial pattern around the well. Payne said such a radial drainage pattern does not characterize a water drive reservoir. Instead, he said, the advance of fluids is "from below."

Testimony described leases overlying the higher part of the anticline geological structure as "updip" leases and those over the lower part as "downdip." Payne stated that in a water-drive field, as oil is produced, wells located in a downdip location at a point begin to produce an oil-water mixture while those updip on the reservoir continue producing oil. As time passes, wells higher on the structure are the last to remain in production. When the volume of water produced by a well becomes so large and the volume of oil so comparatively small that continued production is infeasible, the well is said to "water out."

Wayman Gore, a petroleum engineering expert testifying for PSG, agreed that the Roach and Stephenson leases are downdip of the Snitker, and that the Snitker is the "most updip" lease OPL operates on the western anticline. Payne specified that the

_____

accompanying question and answer, Payne narrated. The animation does not portray drainage from updip to downdip areas of the reservoir; rather, it shows water pushing oil upward to well bores. It depicts wells lower on the structure watering out first. Before presentation of the animation the trial court instructed the jury, "It's being offered only for the purposes of helping you understand a water drive system. It's not being offered for and you will not consider it for any facts that actually apply to this case. [I]t's just offered to help you kind of understand the concept behind the water drive system . . . ."

Roach No. 1 and Stephenson No.1 wells are eighty or more feet downdip of the Snitker wells.

Mike Smith, an engineer and OPL's team leader for development of the field, also testified. He also described the field as a "bottom water drive reservoir." As oil is produced, "you have an endless supply of water underneath that's continuing to provide reservoir energy and support and that oil just migrates [its] way up through that anticline." He characterized an oil flow from an updip location to one downdip as "swim[ming] against th[e] flow." According to Smith, because of the reservoir's "bottom water drive" and its resulting upward flow of fluids through the reservoir, "you should not get a significant amount of supply from updip from across the Snitker lease line." He later told the jury he saw no evidence of substantial drainage of the Snitker lease. Payne also opined that the Snitker lease had not been substantially drained.

Production data provided by Smith showed an increasing percentage of water production from the Roach lease as compared with the Snitker wells. By September 2005 daily production from the Roach No. 1 was 93 barrels of oil and 656 barrels of water. At the same time, the Snitker No. 1 yielded daily production of 258 barrels of oil and 13 barrels of water and the Snitker No. 2 produced 160 barrels of oil and 53 barrels of water. Smith agreed data of this character is expected in a bottom water drive reservoir as the water level rises.

Pointing to such evidence as the close proximity of the Roach and Stephenson wells to the Snitker lease line, the premise underlying the field rules that a well will drain eighty acres, the favorable permeability of the oil-bearing rock in the area of the Snitker

8

lease, and the internal OPL estimates that the Roach well would produce almost twice the oil originally in place, and the Stephenson almost three times, PSG contends the evidence nonetheless conclusively establishes the occurrence of local drainage of the Snitker lease by the two adjoining wells. Viewing the evidence in the light most favorable to the verdict, and indulging every reasonable inference in support of the verdict, *City of Keller,* 168 S.W.3d at 822, however, we find more than a scintilla of evidence supports the jury's negative response to question one. Accordingly, we do not reach an analysis of the evidence PSG considers conclusive. PSG's first issue is overruled.

PSG's two remaining issues concern rulings of the trial court excluding and admitting evidence. We review a trial court's decision excluding or admitting evidence under an abuse of discretion standard. *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex. 2005). Even if evidence is improperly excluded or admitted, we will reverse only if the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *see Bay Area Healthcare Group, Ltd. v. McShane,* 239 S.W.3d 231, 234 (Tex. 2007) (citing Tex. R. App. P. 61.1(a)). To determine if the error of the trial court was harmful, we review the entire record and require the complaining party to demonstrate the judgment turns on the particular evidence admitted or excluded. *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 144 (Tex. 2004); *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753-54 (Tex. 1995).

*Instruction to disregard rebuttal testimony*

By its second issue, PSG argues the trial court erred by instructing the jury to disregard certain testimony of its expert Wayman Gore in rebuttal of a defensive theory raised by OPL.

According to Gore's rebuttal testimony and demonstrative exhibits, underlying a portion of the field, including the Snitker lease, is dolomite rock known for its desirable porosity. Other areas in the field contain less permeable limestone. Data Gore attributed to OPL indicated a seventy-one percent oil recovery factor in the dolomite area of the field while, in his opinion, the limestone area of the field yielded a forty percent recovery factor. The recovery factor of the Snitker lease was fifty-six percent. Gore opined the difference between the recovery factor for the Snitker lease and that of other dolomite leases in the field indicated substantial drainage of the Snitker lease.

OPL objected on the grounds the testimony was not disclosed during discovery and Gore's conclusions were not reliable. During a hearing outside the presence of the jury, the court sustained the objection. When the jury returned, the court gave the following verbal instruction:

> "Ladies and gentlemen, there's been some testimony related to a 71-percent recovery factor. You will disregard any testimony related to a 71-percent recovery factor and any opinion derived therefrom."

Announcing its ruling on OPL's objection, the trial court noted that Gore's recovery factor comparison relied in part on the recovery factor of leases on the eastern anticline. The court further pointed out Gore had testified he had not inspected or studied the eastern anticline. The court had heard evidence that net recovery

10

calculations are affected by rock porosity and other factors such as the fracturing present in the rock. Without reliable data showing that the characteristics of the rock underlying the two anticlines could fairly be compared, the trial court could have considered Gore's recovery factor comparison flawed. *See Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 800-801 (Tex. 2006) (analyzing reliability of expert testimony). We agree with OPL that, based on the information before it, the trial court thus could have found Gore's conclusions regarding the seventy-one-percent recovery factor to be unreliable. We are unable to say the trial court abused its discretion by excluding the evidence of a seventy-one percent recovery factor covered by its instruction.

Even were we to assume it was error to exclude rebuttal testimony related to a seventy-one percent recovery factor, our review of the entire record shows the error harmless. Even if admitted, Gore's rebuttal testimony would not reduce the probative force of evidence we have already found legally sufficient to support the jury's answer to question one of the charge. The excluded evidence of which PSG here complains did not cause the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). We overrule the PSG second issue.

*Undisclosed expert opinion*

By its third issue, PSG urges the trial court erred by allowing OPL expert Brian Sullivan to testify on a previously undisclosed opinion.

PSG posits OPL did not timely disclose expected expert testimony of Sullivan to the effect a permit for drilling an offset well requires an operator prove to the Railroad

11

Commission the operator is not receiving its "fair share" of production. This testimony, PSG urges, left "the jury with the impression that the Snitker had not been substantially drained."

The issue arises in the following colloquy.

Q. [counsel for OPL] In a Rule 38 hearing, does one have to demonstrate that the wells they currently have producing on the tract would not recover their fair share of the oil?

A. [Sullivan] Yes, sir, (sic) that is correct. That's what the test is, and that's what the commission publishes in its books.

In an amended scheduling order the trial court required OPL to designate rebuttal experts by February 1, 2008. The court added, "[s]uch designation shall include disclosures that comply with the requirements of TRCP 194.2(f)." By a writing served that date, OPL designated Sullivan as a rebuttal witness. PSG deposed Sullivan on April 22, within thirty days of trial.

PSG does not complain of the substance or sufficiency of Sullivan's deposition responses. Rather, it contends at deposition Sullivan provided opinions which were not previously disclosed. Because expert opinions were obtained by deposition, generally a *pro forma* supplementation of a disclosure response with the same information is unnecessary. Tex. R. Civ. P. 193.5(a)(2). But here the deposition disclosure of Sullivan's opinions came within thirty days of trial. As we follow PSG's complaint, OPL was obligated to, but did not, obtain a finding of good cause for untimely disclosure or that the untimely disclosure did not cause unfair surprise or unfair prejudice to PSG.

12

Tex. R. Civ. P. 193.6(a),(b).  OPL urged in the trial court that until Gore testified at trial, it was unable to more specifically disclose Sullivan's expected rebuttal testimony.

Even were we to assume the trial court erred by allowing the objected-to portion of Sullivan's testimony, the record does not demonstrate such testimony probably caused the rendition of an improper judgment.  Tex. R. App. P. 44.1(a)(1).  PSG asserts the jury was left with the "impression" that the Snitker lease had not been substantially drained.  But during its case-in-chief OPL presented the evidence we have outlined supporting the jury's negative finding to question one's inquiry of substantial drainage. Since this proof was legally sufficient apart from the opinion of Sullivan, the judgment did not turn on its erroneous admission.  Moreover, because evidence of no substantial drainage was admitted without objection, the complained-of testimony was merely cumulative and its admission harmless.  *See In the Interest of W.J.H.,* 111 S.W.3d 707, 714 (Tex.App.--Fort Worth 2003) (erroneous admission of evidence merely cumulative of that properly admitted elsewhere is ordinarily harmless).  PSG's third issue is overruled.

### Conclusion

Having overruled each of the issues of PSG, we affirm the judgment of the trial court.

James T. Campbell
Justice