

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-16-00282-CV

IN THE INTEREST OF B.F. AND P.F., CHILDREN

On Appeal from the 47th District Court
Randall County, Texas
Trial Court No. 66404-A, Honorable Dan L. Schaap, Presiding

March 29, 2017

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Appellants Debbie and Keith Finch (the grandparents) are the paternal grandparents of B.F. and P.F. Appellee Kaysee Chandler f/k/a Kaysee Finch (the mother) is the children's biological mother. In July 2012 Dean Finch (the father), the children's biological father and the mother's then husband, was tragically killed. In 2013 the grandparents filed suit seeking court-ordered grandparental access to the children. After a bench trial in May 2016, the trial court rendered judgment denying the grandparents' request. They appeal. We will affirm the trial court's judgment.

Background

The father and the mother married in 2004. B.F. was born in 2009 and P.F., in 2010. At the time of the father's death the children were about three-and-a-half years and two years old, respectively.

Before the father's death, the grandparents had regular contact with the children. Debbie Finch (the grandmother) daily cared for B.F. for fifteen months while the mother prepared for a teaching career. After P.F. was born the children began daycare. The grandparents provided transportation for the children to activities such as daycare and medical appointments. During the work-week, the grandparents usually had dinner with the mother and father and B.F. Following P.F.'s birth, the grandmother prepared dinner for the mother, father, and children. She fixed special foods according to the mother's recipes because B.F. had a food allergy. The father worked out of town and picked up the prepared meals on his way home. At times, the grandparents kept the children in their home to assist the mother and father. Often the grandparents saw the children on weekends as well. According to the grandmother's testimony, they engaged in such activities as fishing, going to an amusement park, or playing in the barn. The father's hobby was drag racing and sometimes during the summer they took the children to the races.

Immediately after the father's death a conflict arose between the grandparents and the mother. The mother testified she believed the residence she and the father and children occupied had been a gift. She learned after the father's death that the house was encumbered by a deed of trust securing a note held by the grandmother.

Testimony indicated there may also have been a dispute over the ownership of a vehicle. The grandparents apparently eventually initiated litigation against the mother over the property matters. It appears the children continued having visits with the grandparents from the time of the father's death until Christmas 2012. The mother testified she allowed "quite a few" visits during this time while the grandparents say in their brief the mother rarely allowed visits. According to the testimony of the grandmother and her sister, Rita Ward, after the family exchanged Christmas gifts that year the mother told the grandparents they would not see the children again. At trial the mother denied this version of events.

The parties stipulated that the last intentional visit between the grandparents and the children occurred in January or February 2013. The grandparents presented testimony of three unplanned encounters with the children thereafter, at a wedding, a hardware store and a restaurant. The grandparents and Rita Ward attended a 2013 wedding and testified that the mother held the children back from seeing them. At the hardware store, the children were happy to see the grandmother and Ward but the mother was in a hurry and as they left, the grandmother, Ward, and one, or both, of the children cried. Within the year before trial, the grandmother, Ward, and their friend Shelly McCune encountered the mother, her new husband Colby Chandler, and the children at a pizza restaurant. According to testimony from the grandmother, Ward, and McCune, B.F. appeared "real nervous, just rubbing his hands," the kids looked "like they [were] beat down or been told something," B.F. was "rocking back and forth" and was "wringing his hands," B.F. appeared "terrified" and the children appeared "emotionally distraught."

The grandparents also presented the testimony of Christy Bradshaw Schmidt, a licensed professional counselor. Through her testimony, Schmidt generally informed the court of emotional and developmental problems that children who are denied grandparental access may face. She conceded peer-reviewed research in the area does not offer a great deal of assistance. By analogy she looked to research involving adoptions. Schmidt expressed a "concern" if the children had no connection with the paternal side of the family. But she acknowledged she had not "met," "interviewed," or "assessed" B.F. and P.F., and acknowledged she knew nothing about them except for the testimony she heard during trial. She was therefore unable to render an opinion about these children. On cross-examination she acknowledged that if the children were anxious she could not speak to the cause of their anxiety. When asked on redirect-examination if quarterly grandparental visits "could have a dramatic effect," Schmidt responded, "I can't answer that question specific to these children."

The grandparents called the mother and Chandler adversely in their case-in-chief. Chandler and the mother married in 2014 but he had known the children since July 2013. He is a teacher and coach. Chandler testified he had not observed any physical or emotional problems with the children. He saw no "acting-out" behavior or depression. Chandler believed the children had not recently asked about the grandparents. In her testimony, the mother agreed that the children had a "significant" relationship with the grandparents before the father's death. She testified that at the time of trial B.P. was in the first grade, making all A's, and having no health or behavior problems. P.F. was in kindergarten. He received good reports from school with no behavior problems. She denied either child seemed depressed and agreed both were

4

happy. The mother agreed that being involved in two lawsuits with the grandparents "put a damper" on her interaction with them and, to some extent, her desire to allow their interaction with the children. The mother testified after the financial dispute arose after father's death she felt "personally attacked" by the grandparents and felt a need to protect the children from them.

In her case-in-chief, the mother presented the testimony of Paula Adcock, the former director of the daycare center the children attended. Because of her position she was not directly in classrooms with the children. Adcock testified the children attended the center before and after the father's death. She believed the children handled their father's death, "better than [she] could ever imagine." She observed no reclusiveness or lashing out. And saw no inappropriate behavior by the children. In her opinion, the children "came back [from the father's death] just as normal kids as they were before." None of the center's caregivers having direct contact with the children ever brought a problem with the children to Adcock's attention.

John Jackson administered an afterschool program the children attended once they began public kindergarten and school. He observed B.F. and P.F. on a daily basis. He described the children as "above average," "respectful [and] mindful," "really good." He agreed the children presented no problems. According to Jackson the children were actively involved in the program activities and listened to instructions. He found them "not overly emotional or overly physically aggressive." He had not encountered a problem with either child requiring parental involvement.

Following the close of evidence and counsels' arguments, the court orally rendered judgment:

> I find that the evidence that I have heard, while it could be said to create the possibility that there will be adverse effects of not having the grandparent access that existed before their father's passing, I do not believe the preponderance of the evidence shows that it has or it will significantly impair the child or the children's physical health or emotional well-being. And in light of that conclusion, I must deny the petition of the grandparents.

A final judgment was later signed and findings of fact and conclusions of law were filed at the grandparents' request. In a conclusion of law the court stated:

> The Court finds that [the grandparents] did not establish by a preponderance of the evidence presented in this case that [the mother's] decision to deny access to her [children] by [the grandparents] had or would significantly impair their physical health or emotion well-being.

Analysis

Second Issue

The grandparents present two issues. In their second issue they argue the trial court abused its discretion by failing to grant them access to the children because they conclusively rebutted the presumption under Texas Family Code section 153.433(a)(2) that a fit parent acts in her children's best interest or the evidence supporting the trial court's finding that they failed to rebut the presumption was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

Texas Family Code section 153.433(a)(2) contains "a presumption that a parent acts in his child's best interest, and it permits biological or adoptive grandparents to

6

obtain court-ordered access to a grandchild only if they show that denial of access will 'significantly impair the child's physical health or emotional well-being.'" *In re Derzapf,* 219 S.W.3d 327, 328 (Tex. 2007) (orig. proceeding) (per curiam); TEX. FAM. CODE ANN. § 153.433(a) (West 2014).[1]

We review a trial court's determination regarding grandparent access and possession for an abuse of discretion. *In re J.P.C.,* 261 S.W.3d 334, 336 (Tex. App.—Fort Worth 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985). There is no abuse of discretion if some evidence reasonably supports the trial court's decision. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g). "A trial court has no discretion to determine what the law is or in applying the law to the facts and, consequently, the trial court's failure to analyze or apply the law correctly is an abuse of discretion." *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 483 (Tex. 2001) (orig. proceeding). It is an abuse of discretion for a trial court to grant a

---

[1] The Texas Family Code provides that a court may order reasonable possession of or access to a grandchild by a grandparent if: (1) at the time the relief is requested, at least one biological or adoptive parent of the child has not had that parent's parental rights terminated; (2) the grandparent requesting possession of or access to the child overcomes the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being; and (3) the grandparent requesting possession of or access to the child is a parent of a parent of the child and that parent of the child: (A) has been incarcerated in jail or prison during the three-month period preceding the filing of the petition; (B) has been found by a court to be incompetent; (C) is dead; or (D) does not have actual or court-ordered possession of or access to the child. TEX. FAM. CODE ANN. § 153.433(a). Here, subsections (1) and (3) are not disputed.

grandparent who has not met the standard of section 153.433(a)(2) access to a grandchild. *In re Derzapf,* 219 S.W.3d at 333.

Generally, under the abuse of discretion standard applied in family law cases, legal and factual sufficiency of the evidence are not independent grounds of error, but are relevant factors for determining whether the trial court abused its discretion. *Moroch v. Collins,* 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied); *Crawford v. Hope*, 898 S.W.2d 937, 940-41 (Tex. App.—Amarillo 1995, writ denied); *In re Marriage of Bradley,* No. 07-16-00051-CV, 2016 Tex. App. LEXIS 12828, at *11 (Tex. App.—Amarillo Dec. 1, 2016, no pet.) (mem. op.).

Here, the Legislature has prescribed a preponderance-of-the-evidence standard of proof for a grandparent seeking to overcome the presumption that a fit parent acts in her children's best interest under Family Code section 153.433(a)(2). By that subsection's language, the grandparent must prove "by a preponderance of the evidence that denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being." In our analysis of the sufficiency of evidence supporting the court's ruling on that particular issue, therefore, we will apply the standard typically applied to review of evidence supporting a negative finding on an issue for which the appellant had the burden of proof.

Following a bench trial, the court's findings are reviewed according to the legal and factual sufficiency standards by which jury findings are measured. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). A party attacking the legal sufficiency of evidence supporting an adverse finding on an issue on which the party bore the burden

of proof must demonstrate all vital facts in support of the issue were established as a matter of law. *Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001) (per curiam); *Petroleum Synergy Group, Inc. v. Occidental Permian, Ltd.,* 331 S.W.3d 14, 21 (Tex. App.—Amarillo 2010, pet. denied). The analysis requires the reviewing court first to examine the record in the light most favorable to the verdict for some evidence supporting the adverse finding, crediting evidence favoring the finding if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex. 2005). Some evidence, meaning more than a scintilla, exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997). If, however, no evidence appears to support the finding, the reviewing court then examines the entire record to determine whether the contrary proposition is established as a matter of law. *Francis,* 46 S.W.3d at 241; *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 276 (Tex. App.—Amarillo 1988, writ denied). A proposition is established as a matter of law when a reasonable fact finder could draw only one conclusion from the evidence presented. *City of Keller,* 168 S.W.3d at 814-16; *Brent v. Field,* 275 S.W.3d 611, 619 (Tex. App.—Amarillo 2008, no pet.).

Factual sufficiency review is subject to only one standard of review regardless whether the court of appeals reviews a negative or affirmative finding or whether the complaining party bore the burden of proof on the issue. *M.D. Anderson Hosp. & Tumor Inst. v. Felter,* 837 S.W.2d 245, 247 (Tex. App.—Houston [1st Dist.] 1992, no writ) (citing *M.J. Sheridan & Son v. Seminole Pipeline Co.,* 731 S.W.2d 620, 623 (Tex.

App.—Houston [1st Dist.] 1987, no writ)). The court of appeals first examines all of the evidence, *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex. 1986) (per curiam), and, after considering and weighing all of the evidence, must set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex. App.—Houston [1st Dist.] 1988, no writ). In a bench trial, the court, as fact finder, is the exclusive judge of the witnesses' credibility and the weight given their testimony, and is free to resolve any inconsistencies in the evidence. *Iliff v. Iliff,* 339 S.W.3d 74, 83 (Tex. 2011). It is authorized to believe some, all, or none of a witness's testimony. *Rivas v. Rivas,* No. 01-10-00585-CV, 2012 Tex. App. LEXIS 412, at *5 (Tex. App.—Houston [1st Dist.] Jan. 19, 2012, no pet.) (mem. op.).

To prevail on their petition for grandparental access, the grandparents shouldered a heavy burden. "Parents enjoy a fundamental right to make decisions concerning the care, custody, and control of their children." *In re Chambless,* 257 S.W.3d 698, 700 (Tex. 2008) (per curiam) (quotation marks omitted). "[T]he interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court [of the United States]." *In re Derzapf,* 219 S.W.3d at 335 (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality op.)). Provided "a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family." *In re Derzapf,* 219 S.W.3d at 333 (quoting *In*

10

*re Mays-Hooper,* 189 S.W.3d 777, 778 (Tex. 2006) (per curiam)). After the decision in *Troxel,* the Legislature amended Family Code section 153.433 so that it requires a grandparent seeking court-ordered access to overcome the presumption that a parent acts in her child's best interest by proving "denial . . . of access to the child would significantly impair the child's physical health or emotional well-being." *In re J.M.T.,* 280 S.W.3d 490, 492 (Tex. App.—Eastland 2009, no pet.) (citing *In re Derzaph,* 219 S.W.3d at 333); TEX. FAM. CODE ANN. § 153.433(a)(2).

*In re Sheller,* a case known to the parties and the trial court during the proceedings, illustrates the proof obligation the grandparents faced at trial. 325 S.W.3d 640 (Tex. 2010) (orig. proceeding) (per curiam). In *In re Sheller,* the maternal grandfather and step-grandmother had regular access to the grandfather's two granddaughters before and after the children's mother passed away, and assisted with the children's care during the year following the mother's death. After the relationship between the father and the grandfather cooled, the grandfather sought court-ordered access. The supreme court found the trial court abused its discretion in issuing temporary orders granting the grandfather access because he did not satisfy his burden of proof. *Id.* at 643. The following evidence was insufficient: "(1) the girls displaying anger; (2) one of the girls experiencing instances of isolated bed wetting and nightmares; (3) witnesses who [saw the grandfather] with the children testifying that, from their experiences, denying [the grandfather] access to his granddaughters would impair their physical or emotional development; and (4) the significant impact of loss of maternal family members on the girls, leaving [the grandfather] the only remaining maternal familial connection." *Id.* at 643. The court found this evidence showed only

the children's "understandable sadness" resulting from the loss of a family member and, according to the grandfather and step-grandmother, missing their grandparents. *Id.* at 644.

Here, the record contains evidence supporting the trial court's negative finding on the issue of significant impairment from denial of grandparent access.[2] It includes that showing the children have continued to function well despite the father's death, even in the absence of contact with the grandparents, doing well in day care and then school environments and at home. The grandparents' proof that denial of access would significantly impair the children's well-being was not conclusive. They structured their case around evidence of prior significant contact with the children, especially by the grandmother, the three unexpected public encounters, and the general concepts Schmidt related in her testimony. Nothing established as a matter of law that the children's reactions during the public encounters were caused by insufficient contact with the grandparents or otherwise demonstrated existing or prospective significant emotional impairment. Schmidt candidly acknowledged that she did not know the children, had not interviewed or assessed them, and could offer no opinions for the court's consideration. Moreover, as for factual sufficiency, when all the evidence is considered and weighed the trial court's finding that the grandparents did not rebut the

---

[2] In finding of fact number nine the court found:

The testimony at the final hearing established that, despite the absence of visitation and access between [the grandparents] and the [children] over the past several years, the [children] are in good health, well-behaved, bright, well cared for and adjusting well to the loss of their father through the supportive efforts of [the mother], a fit parent, her new husband and their families.

12

parental fitness presumption is not so weak or so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. Because the grandparents did not overcome the statutory presumption the trial court did not abuse its discretion by denying their petition. The grandparents' second issue is overruled.

First Issue

In their first issue, the grandparents argue the trial court erroneously applied the presumption of section 153.433(a)(2) that a fit parent acts in her children's best interest and thereby heightened their burden of proving significant impairment. What this means, according to the grandparents, is the court incorrectly deferred to evidence of the mother's general fitness to care for the children's basic needs rather than focusing on the grandparents' evidence of significant impairment to their physical health or emotional well-being. The effect of this claimed error seems to be that the court did not assign proper weight to Schmidt's testimony that children who are denied grandparental access may have issues with self-esteem, make poor choices as adolescents, and find their marriages and relationships with their children affected.

The grandparents bolster their argument by referring to the following language contained in the court's order denying their petition for access:

> The Court finds that [the grandparents] have failed to overcome the presumption that [the mother] *has acted* in the best interest of the children in denying [the grandparents] access to the children the subject of this suit, and failed to carry their burden of proof that denial of possession of or access to the children *has* significantly impaired the children's physical health or emotional well-being. (emphasis added).

13

The grandparents argue the language shows the court misapplied the standard of Family Code Section 153.433(a)(2) by focusing on the status of the children at the time of trial rather than giving due weight to the evidence of prospective harm from denial of grandparent access. This means, the grandparents continue, the trial court "exclude[ed] consideration of evidence regarding the future impact that denial of their access to the children would have . . . ."

We do not agree the record indicates the trial court's evaluation of the evidence was misguided by a mistake of law. The court expressed its understanding of the proper legal standard for assessment of the evidence in its conclusions of law, stating:

> The law presumes that a fit parent acts in the best interest of his or her child or children. The presumption extends to a decision to allow or not allow a grandparent access to or possession of a child or children. *Troxel v Granville,* 530 U.S. 57 (2000).
>
> Grandparents requesting possession of or access to children must overcome the presumption in favor of a fit parent by proving by a preponderance of the evidence that denial of possession of or access to the child or children would significantly impair the child's or children's physical health or emotional well-being. TEX. FAM. CODE § 153.433(a)(2).

As noted, the court's conclusions of law contained a conclusion by which the court stated:

> The Court finds that [the grandparents] did not establish by a preponderance of the evidence presented in this case that [the mother's] decision to deny access to her [children] by [the grandparents] *had or would* significantly impair their physical health or emotion well-being. (emphasis added).

The conclusion demonstrates the court did not focus exclusively on evidence of the children's past or then-present wellbeing. It appears to us the grandparents' true complaint in their first issue is the weight the trial court as fact-finder assigned to

14

aspects of the evidence. We reiterate that, as factfinder, weight and credibility determinations were exclusively for the trial judge. An appellate court may not second-guess such determinations. *In re V.H.,* No. 04-15-00511-CV, 2016 Tex. App. LEXIS 1320, at *10-11 (Tex. App.—San Antonio Feb. 10, 2016, no pet.) (mem. op.). At trial, much of the evidence presented by both sides focused on past events. As noted, the grandparents' case essentially turned on their interaction with the children before the father's death and through three brief encounters with the children between February 2013 and trial in May 2016. The mother focused on the children's wellbeing in the almost four-year interim between the father's death and trial. Schmidt explained how denial of grandparental access may affect a child's future wellbeing. But her testimony related only general precepts. It was not specific to B.F. and P.F., and she was unable to offer opinions as to these children's wellbeing.

The grandparents' first issue is overruled.

Conclusion

Having overruled each of the grandparents' issues, we affirm the judgment of the trial court.

James T. Campbell
Justice

15